THE HERCULES. THE FRANCES DOHERTY. DOHERTY et al. v. PENNSYLVANIA R. CO.

(District Court, E. D. New York. October 16, 1919.)

1. SHIPPING ⬤54—LIABILITY OF CHARTERER FOR INJURY TO VESSEL IN WINDSTORM.

A railroad company, having charge of a chartered coal barge for loading at its dock, which it moved with its own tugs, and which, when partly loaded, placed the barge at the end of a pier, in disregard of storm signals displayed by the Weather Bureau but a few hundred feet distant, and left it there, exposed to a severe windstorm for several hours, after being notified by its captain that it was in danger, *held* liable for its injury while in such position.

2. SHIPPING ⬤54—LIABILITY OF CHARTERER FOR INJURY TO VESSELS IN WINDSTORM.

A railroad company, having charge of a fleet of chartered coal barges to be loaded at its dock, which moored them in tiers to stakes in the open bay, *held* to assume the risk from storms to which they were exposed, and liable for injury to one which broke loose and came in collision with others during a heavy windstorm.

In Admiralty. Libels by Mary F. Doherty, owner of the barge Hercules, and by Mary F. Doherty and William H. Doherty, owners of the barge Frances Doherty, against the Pennsylvania Railroad Company. Decrees for libelants.

Macklin, Brown, Purdy & Van Wyck and W. F. Purdy, all of New York City, for libelants.

Burlingham, Veeder, Masten & Fearey, of New York City, and G. W. P. Whip, of Baltimore, Md., for respondent.

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

CHATFIELD, District Judge. These libels have arisen from injuries received on the night of April 5, 1917, by the barge Frances Doherty and the barge Hercules, during a severe windstorm which began late in the afternoon of that day and increased in severity as night came on. In the morning the wind had been blowing from the west. During the day it shifted, and around 4 o'clock in the afternoon it set in strongly from the east, and then more toward the southeast, so that during the early part of the night the full strength of the wind swept across the lower New York Bay and through Raritan Bay, in an unobstructed course from Sandy Hook to the Pennsylvania docks at Port Johnson, South Amboy, where the injured boats were moored. The day had been threatening, and experienced men upon the barges anticipated bad weather. Rain also was indicated during much of the day, and began with the shift in the wind. Both boats had been chartered to carry cargoes of coal to ports up the bay.

The Frances Doherty had been taken from mooring stakes in upper New York Harbor on the 3d of April, by a Pennsylvania tug, and placed with a large number of other barges in tiers, moored to a line of stakes at South Amboy. On the 4th she was taken to Pier B, where she was partly loaded on the south side of the pier. On the afternoon of the 5th she was taken to the end of Pier B, where she was left next to the barge W. S. Keeler, which also received injuries and sank during the storm.

At about 7:30 in the evening, the captain of the Frances Doherty went to an office of the Pennsylvania Railroad upon the pier and asked that his boat be moved, as she was in danger. At about 10:30 he went again to this office and repeated his request, with the result that at about 11 o'clock a tug came to the end of the pier and moved the Frances Doherty to a sheltered berth alongside the railroad pier, where she lay during the night. The next day she was again taken under the dumper, took on two more cargoes of coal, and was towed to Jersey City with her cargo. The captain of the Frances Doherty made some objection to being left at the end of Pier B, when placed there late in the afternoon of the 5th, but was told that the tug was acting under orders. Before the Frances Doherty was removed from Pier B, she sustained injuries which caused her to leak, so that the captain was compelled to pump continuously until after his load of coal had been delivered and she could be repaired.

The barge Hercules had also been brought by a Pennsylvania tug from stakeboats in the upper harbor to the racks at Port Johnson, and was moored in the fleet of barges by the customary lines to the barge ahead, and by three cross-lines to the barges alongside. These lines were all new, and broke during the storm. The weather was so rough that they could not be replaced, and the Hercules received injury by bumping against and riding upon the other boats in the fleet. This fleet consisted of some 10 or 12 tiers, with as many as 8 or 9 boats in some of the tiers. When one of these boats was ready to be placed under the dumper, a tug removed the boat, usually from the head tier, and the boats behind then changed their lines, so as to move up into the space or to make fast to the next boat in line. All the work of moving

these barges from the upper harbor to the stakes, placing them under the dumpers, and replacing them when loaded, was done by tugs of the Pennsylvania Company, which made a charge for towing, filling, and trimming the boats. The only work done by the captain of the barge was to look after his lines and to keep an eye upon the trimming done by the employés of the railroad, in order to see that his boat was properly loaded.

It appears from the testimony that after the storm commenced it was impossible for the captain of the Hercules to leave his boat or to move her in any way, and the fleet of boats fastened to the line of stakes was subjected to the full force of the storm from the southeast. A number of boats in the fleet received some injury from bumping into the other boats and from the breaking of lines. Most of the witnesses testify that the storm was the most violent which they had ever experienced while lying at South Amboy, and the captains of the Pennsylvania tugs all agree that during the height of the storm it was impossible to do more than to lie by in order to save life, if necessary. One of the tugs was unable to leave the sheltered slips during the storm, while another of the tugs was compelled to cast off the lines which it then had to the Keeler, and to seek shelter, in order to avoid danger to the tug itself. Storm signals had been raised in Perth Amboy, only a few hundred feet away from the offices of the men in charge of the terminal at South Amboy, on the morning of April 5th; but these storm signals were not observed by any of these officials, and no precautions were taken by any of the servants of the railroad company during that day to protect the boats from the approaching storm, other than to have the usual equipment of tugs in readiness for use at the piers. During the evening it was realized from the weather conditions, as well as from the complaints of the captains, that the boats were in danger. Some attempt was then made to move those boats which could be moved, and the Frances Doherty was taken on this account from the exposed end of Pier B, while the captains of the three Pennsylvania tugs, of sufficient size to undertake the work, were ordered to go out near the boats attached to the stakes and see what they could do.

The libelants charge negligence on the part of the railroad company in failing to anticipate and to realize fully the danger (which was apprehended by the captains of the barges) in time to move those which had been left in an exposed position at the end of the pier. Negligence is also charged against the railroad company in failing to properly care for the boats in its charge, which had been left lying at exposed positions in the fleet attached to the line of stakes, in the face of a storm threatening danger, not only to the boats in the fleet themselves, but to other boats in the neighborhood, if moorings were broken, as was reasonably to be expected.

It has been held in Wasson v. The William Guinan Howard and the Philadelphia & Reading Railway Co., 252 Fed. 85, 164 C. C. A. 197, that keeping a large string of barges swinging from a short row of stakes, in a gale of a kind to be expected once or more during the winter, was actionable negligence. The case was distinguished from

The Media (D. C.) 132 Fed. 148, affirmed 135 Fed. 1021, 68 C. C. A. 127, where the injury was received during an extremely low tide, occasioned by an unusual gale. In the Howard Case the court held that the railroad should reasonably expect in such a storm trouble from the barges breaking adrift, and that the proximate cause of this danger was the improper nature of the mooring and the choice of location for that mooring, in view of the likelihood of such a situation as was presented when the storm arose. In the case at bar a contractual relation with the railroad company was shown, which could only be inferred in the Guinan Case, and the absence of which was the basis of the dissenting opinion therein.

The case of the Frances Doherty is much like that of Nicholson et al. v. Erie Railroad Co., 255 Fed. 54, 166 C. C. A. 382, in which disregard of storm signals, delay in furnishing assistance, and failure to realize responsibility for a barge in the care of the railroad, were held sufficient to place liability for injury upon the company owning the tugs in charge of the boats, although in that case a different tug had by direction of the railroad company placed the barge at the point in question.

[1] There is little room for argument with respect to the liability of the Pennsylvania Railroad Company for the injuries to the Frances Doherty. The testimony shows clearly that the injuries were received as a result of this storm; that the Doherty was finally rescued without more serious injury, from which the Keeler did not escape. Warning of the situation was earlier brought to the attention of the employés of the railroad company, and it was not until the day superintendent had returned to the pier, after going home from his work, that any efforts were made to find out whether the boats in the railroad company's care were in danger under circumstances which, from the physical location of the piers, would naturally ·be expected in a storm coming up from the direction in which the storm upon the 5th of April was setting in.

[2] In the case of the Hercules, the situation was somewhat different, for unless the entire fleet of boats could be protected or removed to a more sheltered anchorage, nothing could be done to help the boats in the fleet after it was found that the storm was increasing to such an extent as to make their situation dangerous. If the storm had proved no more severe than that which was customarily undergone with safety, the boats could have been left tied to the stakes. When the storm signals and weather conditions indicated danger to the fleet, the captains of the individual barges could do nothing unless orders were given to the tugs to take the boats from the stakes. It is impossible to expect that every time a storm arises the tugs of the company will take all of the· boats moored to the stakes and tow them to more protected points, and if the railroad company finds it is necessary to use the stakes in question as a mooring place, it runs the risk of misjudging the intensity of storms which may arise, and is liable for the consequences resulting to boats in its care, to the same extent as if the railroad company used these stakes to moor its own boats and found the mooring insufficient. Certainly

neither the owner of the boat nor the charterer of the boat was responsible for maintaining the boats at the mooring stakes, while the boats were in charge of the railroad company for the purpose of loading with a cargo of coal.

Responsibility for the care of these boats, in this sense, rests upon the railroad company, and it is not necessary to go so far as to hold them insurers against loss while in that position, although the boats are as substantially in their control as if chartered to the railroad company. The railroad company is responsible for the consequences of the negligent acts of its servants, which cause damage other than that resulting from the ordinary risks of navigation. To moor a boat in an exposed position, where she is liable to be subjected to damage from violent storm, and then to allow the storm to come on, in the face of indications both by storm warnings and by observable changes in the weather, and to do nothing to remove the boat from its dangerous situation, places upon the person responsible for the boat liability for damage, which cannot be excused by showing that the storm was a little more severe than that which could be ridden out safely by the boat in this position. The risk from the violence of the storm is a risk assumed by the person responsible for the boat, if that risk is one which can reasonably be expected, and is not purely and simply an occurrence in the nature of ordinary risk at sea. Care of a fleet of boats calls for care differing from that caused by the navigation of a single boat. Collecting the boats in a fleet increases the responsibility of the person handling the fleet, in situations where a single boat might safely ride the waves which are likely to result during a storm.

In the cases at bar the railroad company was responsible under the circumstances for maintaining the safety of the boats in question, under the conditions which the railroad company created, and is therefore responsible for the damage incurred. Libelants may have a decree.