Hannah M. KELLY, as Executrix of the Estate of James J. Kelly, Libellant,

v.

The PENNSYLVANIA RAILROAD COMPANY, Respondent,

and

Waterman Steamship Corp. and Ryan Stevedoring Company, Inc., Respondents-Impleaded,

and

Arthur Erb, Jr., and Alfred Schechter, individually and as copartners doing business as the Coastal Coopering & Strapping Service,

and

Inge & Company, Inc., Respondent-Impleaded.

The PENNSYLVANIA RAILROAD COMPANY, Libellant,

v.

WATERMAN STEAMSHIP CORP., Ryan Stevedoring Company, and Hannah M. Kelly, as Executrix of the Estate of James J. Kelly, Respondents.

Nos. 18563, 18788.

United States District Court
E. D. New York.

Feb. 24, 1956.

Alexander & Ash, New York City, Proctors for libellant, Hannah M. Kelly, executrix, Sidney A. Schwartz, New York City, Advocate.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, Proctors for respondents-impleaded Ryan and Waterman, Edward C. Kalaidjian, New York City, and Robert S. Stitt, New Rochelle, N. Y., Advocates.

Burlingham, Hupper & Kennedy, New York City, Proctors for respondent The Pennsylvania Railroad Company, Robert A. Feltner, New York City, Advocate.

Frederick Pennell, New York City, Proctor for respondents-impleaded Arthur Erb and Alfred Schechter, individually and as co-partners doing business as the Coastal Coopering and Strapping Service.

GALSTON, District Judge.

These two actions were consolidated for the purposes of the trial. The libels arose out of the damage sustained by the scow Margaret and her cargo of fruit on or about December 2, 1946.

The Margaret was under oral harbor charter to the Pennsylvania Railroad Company for the period from August 29, 1946, to December 4, 1946. On December 4, 1946 the Pennsylvania Railroad Company returned the scow in a damaged condition.

On November 28, 1946 there were loaded on board the Margaret, at Pier K, Jersey City, 3,448 boxes of fresh fruit. On the morning of November 29, the barge was towed from Jersey City to the south side of Pier 6, Bush Docks, Brooklyn, where the fruit was to be loaded on the Waterman Steamship Company's vessel Madaket. The barge Margaret was left by Pennsylvania at the bulkhead at Pier 6. On November 30th, under orders of the Ryan Stevedoring Company, who were the pier operators, the scow was shifted from that pier to make way for an incoming vessel. The Rowan Card, a tug of the Ryan Stevedoring Company, shifted the Margaret to the end of Pier 3, and there moored her outside of a New York Central barge.

The Bush Docks point northwest, and have little or no protection from the northwest winds coming across the upper bay. At the time of the shift, on November 30th, the weather was mild

and cloudy, with a slight easterly wind. However, on December 1st, at about 4:37 A. M., the local weather station received a warning of increasing southwest winds, becoming twenty to thirty miles per hour in the morning, and shifting to northwest about noon-time. At about 6:00 A. M. small craft warnings were displayed from Eastport to Block Island, and were maintained throughout December 1st and December 2nd. At 1:15 P. M. on December 1st, a cold wave bulletin was received and distributed to the press and radio, which read in part: "The temperature will fall far below freezing in all sections and will be accompanied by fresh to strong northwest wind."

Ryan made no attempt to move the Margaret on December 1st, despite the change in wind conditions. Though at 5:00 P. M. that day the wind had somewhat abated, from 10:00 P. M. until 8:00 A. M., December 2nd, it steadily increased. At 3:00 P. M. it remained over 45 miles per hour, with big gusts of over 55 miles per hour.

Ryan endeavored to get a tug at 7:30 A. M. on December 2nd to move the Margaret and the scow Delta because of their exposed position. It is significant that the tug Rowan Card arrived, but her captain refused to work because of the weather. Calls to other tugs were unsuccessful, with the result that the Margaret and the Delta remained exposed. At about 7:30 A. M. on December 2nd the house of the Margaret collapsed, crushing some of the boxes, spilling others overboard and exposing most of the rest to freezing weather. The banging of the Margaret against the Delta brought about damage to the hull of the Margaret as well as to the cargo.

■ It becomes important to ascertain whose negligence brought about the damages complained of. It seems reasonably clear that there was no active negligence of the Pennsylvania Railroad Company. However, the burden is upon the Pennsylvania Railroad Company as charterer to explain the damage. See The Moran No. 10, D.C., 41 F.2d 255;

Tomkins Cove Stone Co. v. Bleakley Transportation Co., 3 Cir., 40 F.2d 249. Indeed the law is so well settled that these authorities need not be analyzed in this opinion. The Pennsylvania's explanation is that the Ryan Stevedoring Company was primarily responsible for bringing about the damages. The Margaret was in its possession and control, and Ryan exercised dominion by shifting her to an exposed position and in failing to remove her from the unsafe position at the end of Pier 3. Ryan thereby contracted liability. See Palmer v. Agwilines, 2 Cir., 135 F.2d 689; C. F. Harms Co. v. Erie Railroad Co., 2 Cir., 167 F.2d 562, and Roah Hook Brick Co. v. Erie Railroad Co., 2 Cir., 179 F.2d 601. The evidence establishes convincingly that the end of Pier 3 was an exposed location, and was a dangerous place for a barge to be moored in a northwest storm. The weather reports issued early on December 1st, and again later in the day, should sufficiently have apprised Ryan of the necessity of exercising every effort to move the vessel. See Golden Rule, 1925 A.M.C. 297, in which it was said:

"It seems to me that after so many years of experience with the usefullness of weather bureau warnings, all persons engaged even in harbor operations should be bound to pay attention to them, and failure to do so is evidence of negligence."

The evidence establishes the fact that it would have been feasible for Ryan to have removed the Margaret from the end of Pier 3 some time shortly after getting the early weather report.

What was said in The Hercules, D.C., 261 F. 529, 533, affirmed 2 Cir., 269 F. 959, is especially pertinent:

"To moor a boat in an exposed position, where she is liable to be subjected to damage from violent storm, and then to allow the storm to come on, in the face of indications both by storm warnings and by observable changes in the weather, and to do nothing to remove the boat from its dangerous situation,

places upon the person responsible for the boat liability for damage, which cannot be excused by showing that the storm was a little more severe than that which could be ridden out safely by the boat in this position."

I conclude that the Pennsylvania's explanation is adequate and therefore hold Ryan primarily liable, and Pennsylvania only secondarily liable in respect to the asserted damages.

There is a contention made that Kelly was at fault also in that his barge was unseaworthy, and that his bargee was absent.

It was established at the trial that prior to the chartering of the Margaret, two inspectors of the Pennsylvania Railroad had examined the Margaret for the purpose of determining whether she was seaworthy for the charter. They found damage in the hull, and they classified the ship as fair and recommended the barge for charter, despite the fact that they had not inspected the sills, the reason apparently being because the sills were partly covered up at the time of the inspection. Huish, one of the inspectors, said that he could not examine the sills—"not allowed to probe in another man's boat to find out what condition the wood is in."

After the collapse of the house a survey was conducted, and it was discovered that the sills were badly decayed, and could readily have contributed to the damage to the house. Since the condition of the sills was not known to the charterer, he cannot be charged with an implied or specific waiver of the warranty to be read into the charter. Thomas Jordan, Inc., v. Mayronne Drilling Mud, Chemical & Engineering Service, 5 Cir., 214 F.2d 410; Dempsey v. Downing, 4 Cir., 11 F.2d 15.

Thus far it is apparent that the main cause of the damage was the shifting of the barge to an exposed position, and leaving her in that exposed position during extremely dangerous weather conditions. But the barge itself is not free from fault. Three of the five surveyors who attended the survey of the Margaret on December 11, 1946 testified to the effect that the Margaret was unseaworthy. Mulligan said that since the freight-house had completely collapsed, they were able to examine the sills. He testified that "the only fastening that the house had was on sills and combings; these boards were so badly decayed that they would not hold fastening. This condition contributed to damage." He was of opinion that decay of the sills would put the house in a weak condition. Johansen, who also attended the survey, observed that the sills were badly decayed; the fastenings were loose down through the beams. Kjems, the third witness, testified by deposition, and he agreed that "the sill, which is the foundation of the house, was all rotten, absolutely gone."

Finally, as a factor in the causation of the damage, it was argued that the stowage shifted. As to the rearrangement of the stow, there is no evidence that shows that it was not proper or customary under the conditions described at the time of the strapping. The Margaret was to be unloaded shortly after arrival at the pier. It was contemplated then that the trip would be from the pier to the side of the Madaket, at the Bush Docks. The cargo was in good condition when delivered at the Bush Terminal by the Pennsylvania on the day that the Margaret was delivered to a safe berth. It was not shown that Arthur Erb, Jr., and Alfred Schechter, doing business as the Coastal Coopering & Strapping Service, and Inge & Company, Inc., as freight forwarders, were informed at the time that they worked on the cargo that the Margaret was thereafter to be placed in an exposed and dangerous position.

Whether the absence of the bargee from the Margaret contributed to the accident was not established.

In the first libel, therefore, the libellant is entitled to a decree against the Ryan Stevedoring Co., Inc., which is primarily liable; and secondly against the

Pennsylvania Railroad Co. In the matter of hull damage, however, as well as in damage from the collapse of the freight-house, the libellant was contributorily negligent in failing to supply a seaworthy vessel. The primary liability of Ryan, I think, should be fixed at fifty per cent of the damage to the barge, and fifty per cent should be borne by Kelly, the libellant.

In the second libel, again the malefactors are Ryan and Kelly, and in the same ratio. Accordingly the Pennsylvania Railroad Company, as libellant, may have a decree against those respondents.

Concurrently with this opinion, appropriate findings of fact and conclusions of law will be filed.