## THE D. NEWCOMB.

*(District Court, W. D. Pennsylvania. May Term, 1883.)*

1. COLLISION—FAILURE TO ANSWER SIGNAL—RULE 8.

Where two steamers are running in the same direction, and the one astern, under the eighth rule for the government of pilots on western rivers, signals her desire to pass the one ahead, the latter is bound to answer the signal, and the failure to respond is a fault in her; but such failure, so far from exonerating the pursuing steamer from taking the care demanded by the circumstances to avoid a collision, calls for special caution on her part.

2. TOW-BOAT ON WESTERN RIVER—LIABILITY FOR NEGLIGENCE—NOT COMMON CARRIER—ABANDONMENT OF WRECKED TOW.

While the owners of a western-river tow-boat, who have undertaken to tow a barge and deliver it at an agreed place, are not common carriers, they are bailees for hire, bound to fulfill their engagement, unless prevented by some cause affording lawful excuse; and if, by reason of their culpable negligence, the barge while in their exclusive custody is wrecked and sunk, the duty of rescue, if practicable, is upon them. Hence, when sued by the owner for a total loss, they will not be heard to allege that he might have mitigated the damages by raising the barge.

In Admiralty.

*Barton & Son*, for libelant.

*Knox & Reed*, for the D. Newcomb.

*Kennedy & Doty*, for the C. W. Batchelor.

ACHESON, J. The complainant was the owner of a barge having aboard a cargo of cinder, lying in the Allegheny river at the foot of Thirty-second street, Pittsburgh, which the steam tow-boat D. Newcomb undertook to tow from that point to Braddock, on the Monongahela river. On the morning of April 21, 1882, the barge was delivered into the custody of the Newcomb, which proceeded therewith down the Allegheny river. At this time the steam-boat C. W. Batchelor was coming up the Ohio river to her landing on the Monongahela river at the foot of Wood street, in the port of Pittsburgh. When the Newcomb had reached the Union bridge which spans the Allegheny near the confluence of the two rivers, the Batchelor was

several hundred yards below. The boats were then at least one-half a mile apart, but were plainly visible to, and were seen by, their respective pilots. When the pilot of the Batchelor first saw the Newcomb, he was in doubt whether her destination was down the Ohio or up the Monongahela; but when, from her movements, he was satisfied it was the latter, he signaled under rule 8, governing steamers running in the same direction. His signal was one sound of the steam-whistle, signifying his desire to pass up to the right. At this time the boats were from two to three hundred yards apart. To the Batchelor's signal the Newcomb gave no answer. The Batchelor, however, proceeded without abatement of speed up stream, in accordance with her signal, keeping as close to the south shore as was reasonably safe, having respect to the craft lying there. When she passed under the Union bridge the engine of the Newcomb was stopped, but to avoid the bar which is immediately below the bridge the steam was turned on and a few forward revolutions made. The libelant's barge was lashed to the starboard side of the tow-boat, which rendered it less easy to round the point at the confluence of the rivers than it would have been had it been on the larboard side; but the starboard position of the barge was not of itself negligence. However, before the Newcomb had rounded the point, and while yet nearly square across the river, she collided with the Batchelor, striking the latter on her larboard side about midship with the forward end of the barge, which projected in front of the boat. The stroke was with such force that the guard of the Batchelor was broken in, and the Batchelor, catching one of the end planks of the barge, tore it off. The barge taking water rapidly, the Newcomb cut the lines and turned it adrift, and it sunk in a few minutes.

That the disaster was not occasioned by any *vis major* is certain. Undoubtedly it was the result of culpable negligence. The collision occurred about 8 o'clock in the morning, when it was broad daylight; the boats had been plainly visible to each other for some considerable time; there was ample space of water and no unusual current or any stress of weather. Indeed, there was no sort of excuse for the collision; therefore each boat puts the blame on the other. But the libelant charges negligence upon both boats, and has filed this libel against them jointly. A very careful examination of the proofs has brought me to the conclusion that the libelant is right.

The first default was on the part of the Newcomb in not answering the Batchelor's signal. The rules imperatively required her to answer.

She had the privilege of choosing her course, and the Batchelor was bound to conform to her return signals; but she gave none. Her pilot, Kirkwood, says, "I expected her [the Batchelor] to stop her engines when I refused to answer her signal." But, according to the weight of the testimony, the silence of the Newcomb indicated to river men acquiescence in the Batchelor's expressed desire to pass on the right, and the pilot of that boat so understood it. The pilot of the Newcomb ought not to have left the matter in doubt. Moreover, he knew the intended movements of his own boat, the then strength of the current of the Allegheny, the difficulty in rounding into the Monongahela by reason of the position of the tow, the proximity of the bar and its interference with the free use of his wheel, and in the exercise of reasonable nautical skill he should have been alive to the danger of collision in time to warn off the Batchelor. Such danger-signal, given within any reasonable time, would have averted the catastrophe. The failure to give such signal was the second fault of the Newcomb, I think; and, in my judgment, there was a third. The testimony—especially in connection with the diagram of the *locus in quo*—satisfies me that the Newcomb failed to back as soon as she might have done, and, under the circumstances, should have done. True, she was backing at the time of the collision, but she began too late. The effect of the collision upon the Batchelor demonstrates that the witnesses are right in saying that the Newcomb still had considerable headway.

But clearly the Batchelor was also to blame. The failure of the Newcomb to answer her signal did not exonerate her from exercising the care which the occasion plainly demanded. Indeed, in the then circumstances of the Newcomb, her failure to answer the signal called for special caution on the part of the pilot of the Batchelor. He observed that the Newcomb proposed to round into the Monongahela river, and was in the execution of that maneuver. He also saw, or was bound to see, that she had not yet succeeded in straightening herself in the stream, but that her movement with unchecked headway was across the stream, in the direction of the pathway of his own boat. Nevertheless, the Batchelor proceeded with undiminished speed. Ascending against considerable current, it is shown she could have been stopped within the distance of 40 to 50 feet. It is, therefore, manifest that in the exercise of any reasonable degree of care on the part of the pilot of the Batchelor he must have seen the impending danger and could easily have avoided the collision by

stopping his boat. Augustus Seiferth, an expert witness, who was on the guard of the Batchelor, testifies: "There was plenty of room between them [the boats] until they got close together. I don't think either one paid much attention until they were right into each other." This I have no doubt is the exact truth.

The cargo of cinder did not belong to the libelant, but he had expressly assumed the risk of its safe delivery at Braddock, and is responsible to the owners, who have rendered a bill against him. It therefore is properly embraced in his claim. Its value does not seem to be disputed. Having lost his commissions as the direct result of the collision, the libelant is also entitled to recover them in this suit. *Nixon* v. *The George Lysle*, 2 Fed. Rep. 259. The several smaller items of claim, for the furniture, etc., of the barge, seem to be sufficiently proved. The barge itself, however, is, I think, somewhat overvalued by the libelant. Here the testimony of Mr. Thompson, who overhauled and repaired the barge shortly before the collision, is the most reliable evidence. His estimate, which includes the cabin, is $900, and this valuation I adopt, thus reducing the libelant's bill $125.

It is alleged, however, on the part of the defense that the barge and cargo need not have been a total loss, but might have been raised with comparatively little expense and trouble, and the loss thereby greatly reduced. The proofs, however, it seems to me, fail to sustain this allegation. In the first place, it is shown that the water rose within a day after the collision and remained so high, according to the testimony of William Merrington, an experienced wrecker, and the libelant, it was not possible to raise the barge for five or six weeks. This testimony is not impugned by any witness, and in view of the further evidence that the work would have taken six or seven days, is not, I think, contradicted but rather corroborated by the water record. What the condition of the wreck was at the end of five or six weeks is problematical. It is certain that at any time it would have cost considerably more to raise the cargo than it was worth. And, according to the weight of the evidence, the net saving from the whole wreck, in the most favorable view, would have been quite small. Taking into account the loss of time, it is, at least, very doubtful whether any substantial benefit would have resulted to the defendants. So that, were this defense available to the defendants, I think it has not been made out.

But it seems to me the defendants are not in a position to invoke the principle enforced in the cases of *Clarke* v. *The Fashion*, 2 Wall.

Jr. 339, and *The Baltimore*, 8 Wall. 377, that the owner of a wrecked and sunk vessel cannot abandon her as for a total loss, if she can be raised and the damages thus lessened. In neither of those cases, and in no case to which my attention has been called, did the wrong-doer have the charge of the injured vessel at the time of the collision, or stand in any contract relation thereto. But here the Newcomb had undertaken to tow the libelant's barge and deliver it, with its cargo, at Braddock; and in pursuance of this engagement she took· actual possession of the barge, which was lashed to her side and in her exclusive custody. It is true, the owners of the tow-boat, in re-spect to the barge, were not common carriers; but they *were* bailees for hire, and bound to carry out their undertaking with that degree of caution and skill which prudent navigators usually employ in simi-lar services. *The Webb*, 14 Wall. 406; *Brown* v. *Clegg*, 63 Pa. St. 51. Herein they failed; and the barge being in a sinking condition, by reason of the want of proper care on the part of the Newcomb, was, by the master of that vessel, cut loose; and, if improperly abandoned, it was so abandoned by the Newcomb. The owners of that boat were under contract obligation to deliver the barge at Brad-dock, unless prevented by some cause affording lawful excuse; and, having negligently sunk the barge, the duty of rescue, if practicable, was upon them.

Let a decree be drawn in favor of the libelant, in accordance with the views herein expressed, for the sum of $1,344.50, with interest from April 21, 1882, and costs.