## THE WILLIAM GUINAN HOWARD.

(Circuit Court of Appeals, Second Circuit. May 1, 1918.)

No. 252.

1. COLLISION ⬅️70—LIABILITY—BARGES.

A coal barge, which had been towed by tugs of a railroad company to a point where she was moored with other barges, *held* not at fault for a collision with another vessel in the vicinity, resulting when such barges by reason of a gale broke from the moorings; the fault in no way being that of the barge or her master.

2. COLLISION ⬅️70—LIABILITY—PERSONS AT FAULT.

Where a railroad company's tug, which had a flotilla of coal barges in tow, moored them in such a way that the whole flotilla relied on the mooring lines of the first barges, *held*, that the railroad company was

---

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

liable for the damage of a collision resulting when the barges, by reason of a gale not unusual at that time of the year, broke from their moorings.

Hough, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Burtis M. Wasson against the barge William Guinan Howard, her tackle, etc., claimed by Thomas J. Howard, who impleaded the Philadelphia & Reading Railway Company. From a decree for claimant and the railway company, libelant appeals. Reversed, and decree entered against the Railway Company.

Appeal from a decree in admiralty entered on the 19th day of October, 1917. The proceeding was commenced by a libel in rem against the barge William Guinan Howard on behalf of the schooner Henry H. Chamberlain for a collision on the 26th of December, 1915, on the anchorage grounds on the Staten Island side of the Arthur Kills, which separate Staten Island from the New Jersey shore. The Chamberlain, which was lying at anchor in the Kills on that day, was struck by the Howard, then adrift, and injuries were done to the schooner's bow.

The answer of the Howard alleged that she was picked up at Mariner's Harbor, Staten Island, by tugs of the Philadelphia & Reading Railroad, and had been towed to the stakes in possession of the railroad at the locus in quo; that she was placed at the rear end of a flotilla of light boats some 600 feet or more in length, and was left in an exposed and unprotected position, so that she swung with the tide; that on the morning of December 26 a storm from the northwest broke the barges adrift; and that without her fault and negligence she collided with the Chamberlain. The Howard filed a petition against the Philadelphia & Reading Railroad Company as the party in fault, which answered that it had left the Howard in the usual place for mooring light boats, as had been done for many years; that the place was proper for that purpose, except under extraordinary conditions; and that she broke adrift because of an unprecedented gale on the day in question.

On the trial it appeared that the Chamberlain had anchored with about 30 fathoms of chain on the Staten Island side of the Arthur Kills on the anchorage ground on the 25th of December in a place of ordinary safety. The Howard, a light coal boat, had been towed to Port Reading by the Philadelphia & Reading Railroad on the night of the 24th. She was the last boat of some 40 or 50 light coal boats, which the railroad was taking to Port Reading to fill with coal. The tow arrived at about 11:30 at night, and was laid behind a number of other light boats, which were there waiting. The entire flotilla, when the extra 40 or 50 boats had been added, contained some 60 or 70 in all. From the bulkhead on the New Jersey side of the Kill extend three coal piers, and to the southwest of these extend a double row of stakes about 300 feet in length, from the bulkhead at the end of which and at right angles there extend another double row of stakes, 222 feet in length, parallel with the bulkhead and making an L. All the slips were full, and the flotilla was tailed from the corner of the L of stakes so formed, so that it lay alongside. As it extended some 700 feet from the corner, the greater part of its length was beyond the outshore leg of the L, which, as has been said, was only 222 feet in length. In consequence, the whole flotilla relied upon the mooring lines of the first barges, and, as those alongside the stakes were not made fast, it swung out into the stream with the tide.

In the early morning of the 25th the wind was moderate, but it began to rise about 6 o'clock, and blew through the 25th at a general average of between 30 and 40 miles an hour, reaching a maximum by midnight of the 25th of 62. The gale increased in the early morning of the 26th and by between 5 and 7 o'clock in the morning reached a maximum of 66 miles from the northwest, with an hourly wind movement of between 50 and 60 miles an hour. The northwest wind carried the flotilla off shore, so that it hung substantially

at perpendicular to the stakes at which the first barges were moored. At about 6 o'clock in the morning the strain proved too great for some of the fasts, apparently those which held the second tier to the first, and the whole flotilla broke adrift. The Howard, driving across the Kills, came in contact with the bow of the Chamberlain and did the damage here sued for.

Alexander & Ash, of New York City (Peter Alexander, of New York City, of counsel), for the Henry H. Chamberlain.

Herbert Green, of New York City, for the William Guinan Howard.

Pierre M. Brown and Macklin, Brown & Purdy, all of New York City, for Philadelphia & R. R. Co.

Before HOUGH, Circuit Judge, and LEARNED HAND and MAYER, District Judges.

LEARNED HAND, District Judge (after stating the facts as above). [1] We all accept the excuse of the Howard that she was powerless under the circumstances. The only possible fault that can be charged against her is that her master, during the night of the 25th and 26th, should have gone ashore for help. It seems to us somewhat fantastic to suppose that a bargemaster under the circumstances could or should have made any effort to have the boat transferred. She was a helpless scow, without means of locomotion, subject to the control and under the direction of the railroad, which towed her to her position, and we can see no fault on her part.

[2] The majority of the court, however, does not agree that the railroad company was free from negligence. It seems to us inherently dangerous to lay so large a number of empty barges with high freeboard alongside a string of piles situated as these were, and without any control except the mooring of the first tier. In the first place, we think that to allow such barges to swing out on every tide is a serious obstruction to navigation (Hughes v. Penn. [D. C.] 93 Fed. 110, 103 Fed. 925), even in fair weather: but as to that we do not think it necessary to make any finding. To allow them to swing in a gale reaching a maximum of 66 miles an hour seems to us, however, beyond any excuse. The almost inevitable result is disaster. The combined resistance against the wind of a string of barges 60 or 70 in number is almost certain to result in parting the mooring of the whole or the fasts between some of them. What happened seems to us to have been almost inevitable. Moreover, the railroad concedes that the same thing had taken place five or six times in the past, and, while these accidents extended over a long period of time, they were ample warning that the practice was unsafe, and necessarily unsafe, not only to the barges, but to any shipping which lay on the anchorage grounds to leeward.

The railroad's excuse is that the row of stakes did not extend far enough to the southwest, so that each tier might be made fast to the piles, and it is suggested that the railroad did not own land on which stakes could be driven. Nothing of the sort appears in the testimony; but, if it did, it would be no excuse, assuming, as we must, that the practice was dangerous. Either the railroad must acquire sufficient

land for its purposes or it must not moor so many barges in a string at that place. How wide each tier need have been to accommodate all the barges at that time we do not know, and it is unnecessary to inquire: The railroad owed a duty to other shipping in the Kills to prevent what happened here.

It is suggested that The Lyndhurst, 147 Fed. 110, 77 C. C. A. 336, exonerates the railroad. In that case the accident happened through the failure of the barge to make fast a tow line to the tug. We do not see the application of the case. There is no evidence that the fasts between the first and second tier were improper. It was not to be expected, in our judgment, that they should hold against such a strain as was imposed upon them. Nor do we find that the Edwin Terry, 162 Fed. 309, 89 C. C. A. 17, touches this case. The Media (D. C.) 132 Fed. 148, Id., 135 Fed. 1021, 68 C. C. A. 127, is not in our judgment in point either. In that case the barge was injured because of the extraordinarily low tide caused by a high gale. The case was decided upon the theory that the extraordinarily low tide was not to have been anticipated. Judge Adams particularly distinguished the case from one in which the boat was left subject to swing in any change of wind. The injury there was done by a submerged pile upon which the barge was impaled, and which, as we understand, was not known at the time. This chain of circumstances seems to us much more remote than that in the case at bar.

The railroad asserts that this way of mooring the flotilla has been customary in the place in question for 25 years past; but it does not appear that it was the custom of any but this respondent, and in any event it had been amply demonstrated in the past that it was a dangerous custom, and as such it cannot be excused. The gale was of no extraordinary violence for the season. It was of a kind to be expected once or more during any winter in these waters, and in accepting a risk no more uncommon the railroad made itself responsible for the ensuing damage.

Judge HOUGH thinks that the Philadelphia & Reading Railway Company was not in the usual relation of tug to its tow at the time of the storm. It is true that the allegations upon which that conclusion might be based were denied in the railroad's answer to the petition, and that the only proof upon the trial was that of MacGregor, who said that the boats were going down to Port Reading to load coal; that being the place where the railroad did load coal on barges. It is at least equally possible that the agreements included, not only towage to Port Reading, but coaling there, in which case it would be responsible for a tug's ordinary care, due to a tow while moored. That the railroad did select the berth and leave the barge there is conceded. We do not think that the record justifies our speculation as to whether its duty was then at an end, because neither in the opinion below, nor in any of the briefs, is it suggested that the general relation of tug to tow had ceased. The cause having been disposed of throughout upon the assumption that the sole question was of the railroad's negligence, we hardly think it our duty, or indeed our right, to raise such a point of our own accord.

The decree is reversed, and a decree will be entered against the Philadelphia & Reading Railway Company, with costs in both courts, and in favor of the Howard, but without costs in either court.

HOUGH, Circuit Judge (dissenting). The corporation which the court holds responsible for the consequences of a violent storm was not by charter or otherwise in charge of the Howard, at or near the time she went adrift. It did tow the barge, and that contract was fulfilled when the Howard was delivered where she wanted to go, at a customary mooring place, safe at the time of delivery. It also offered the wharf or mooring, where the barge safely lay until an unusual storm tore her and other boats loose. The place and method of fastening were well known, safe in most weathers, and nothing caused apprehension of danger when the Howard was made fast.

The barge went where she did by the volition and for the purposes of her owner, and when the railroad company had safely towed her to destination, and furnished her with a usual mooring place, their mutual relations were ended. I am not advised by the majority opinion of what breach of contract the railroad was guilty; but by implication it seems held to a sort of general guardianship of anything lying at the stakes. Such a duty or office has never heretofore been held to exist, and is not in my judgment founded either on positive law, or good maritime analogy.

Therefore I dissent.