## DOHERTY v. PENNSYLVANIA R. CO.

### DOHERTY et al. v. SAME.

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

Nos. 73, 74.

1. Towage ⊂⇒11(1)—Tug's responsibility continuous, until barges return to starting point.

Where defendant railroad's tugs towed barges to South Amboy, loaded them with coal, and returned them to New York, without the barge owner intervening during the voyage, the tug's liability is continuous until the barges were returned to New York, and includes liability for injuries sustained while moored at South Amboy.

2. Towage ⊂⇒11(1)—Tug must exercise reasonable care to avoid injuring barge.

Ordinarily a tug is neither a common carrier nor an insurer, but must exercise reasonable skill and diligence to avoid injury to its tow.

3. Towage ⊂⇒11(10)—Tug held liable for injuries sustained by moored barges.

Evidence that a tug, in mooring barges, disregarded Weather Bureau storm signals, and was dilatory in furnishing assistance to the barges, etc., held to establish the tug's negligence, rendering it liable for injuries sustained by the barges pounding against each other.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of New York.

Libels by Mary F. Doherty, owner of the barge Hercules, and by Mary F. Doherty and William Doherty, against the Pennsylvania Railroad Company. Decrees for libelants (261 Fed. 529), and respondent appeals. Affirmed.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for appellant.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROGERS, Circuit Judge. These cases were tried together, and on appeal were heard together in this court, and now will be determined together in one opinion.

The libelant Mary F. Doherty was and is the owner of the barge Hercules, and the respondent was and is the owner of various steam tugs engaged in towing vessels between New York and South Amboy, N. J. It is complained that in April, 1917, the respondent agreed to safely tow the Hercules from New York to South Amboy, there to load the barge with a cargo of coal and then tow the same back to New York City, and that all shiftings of the barge were to be performed by the respondent; that pursuant to the contract one of the respondent's tugs, on April 4, 1917, took the Hercules in tow with other boats, at New York, the tow being made up in tiers of several boats abreast, and started for South Amboy; that on account of the condition of the weather the tug tied up the tow at Bayonne Stakes and remained there for a time, and then resumed the trip to South Amboy; that the wind was blowing very strong, from the eastward, and that storm signals were displayed from 10 a. m. of April 5, and on the arrival of the tow at South Amboy at 8 p. m. on that day; that the wind blew a gale for hours, and that the tug placed the Hercules at what is known as the Stakes, and that the rough sea caused the barge to pound against the other boats and barges lying at the stakes; that the tug left the Hercules pounding and unprotected in the heavy sea and wind that prevailed.

The following excerpt from the testimony shows how the Hercules was placed:

"Q. When you got to South Amboy, where was your boat placed? A. Over in the stakes.

"Q. Do you know how many boats were in the tow with you going down? A. There were about 25 or 30 boats.

"Q. They were all light, were they? A. They were all light boats.

"Q. They were placed at the light stakes at South Amboy? A. Yes; there were some more boats laying along there before we arrived there.

"Q. How were these boats placed along the stakes? A. In a tier.

"Q. Then next to the stakes were your boats lengthwise, or head on? A. No; side on.

"Q. There was a line of boats against the stakes, and other boats were made fast outside of them? A. Sure.

"Q. How many boats were made fast outside of the stakes and between your boat and the stakes? A. 10 or 12 boats.

"Q. Do you mean 10 or 12 tiers? A. Yes, sir.

"Q. Were there 10 or 12 rows of boats between the stakes and your boat? A. 10 or 12 boats in one tier right across the river.

"Q. Were those boats all evenly spaced, one outside of the other, or were they mixed up? A. They were laying in one tier, and they were even in there then, one outside of the other.

"Q. That was the first row of boats? A. That was the first row of boats.

"Q. Then there were boats outside of them? A. Yes; they were laying about 10 feet ahead of us; 10 or 12 feet between the tiers."

It is alleged that as a result of this pounding against the other boats the Hercules was damaged, the lines parted, and the fenders on the barge were carried away. It is claimed that the damages which followed were due to the respondent's negligence. Damages were

asked in the amount of $1,700. A decree has been entered in favor of the libelant in the amount of $1,724.87.

The libelants Mary F. Doherty and William Doherty, who were and are the owners of the barge Frances Doherty, complain that the respondent towed her from New York to South Amboy, where she arrived on April 4, 1917, and she was moored about in the center of Pier B. It appears that the respondent then began to load her with coal, and that on April 5, about two o'clock in the afternoon when she had received on board about 622 tons of coal, the respondent towed her to the end of the pier and there made her fast. At that time there were various other boats and barges lying across the face or end of the dock; one barge lying under the stern of the Doherty, the barges lying stern to stern. The respondent placed another barge outside the Doherty, so that it lapped on the Doherty and the barge under the Doherty's stern. At the time the wind was blowing very strong creating quite a sea, which caused the barges and boats to pound one another and against the face of the dock.

On the same evening of April 5, at 5 o'clock and again at 7:30 o'clock, the master in charge of the Doherty informed the respondent that harm was likely to result from the situation in which the barges were placed, and was informed that a tug would be telephoned for to remove the barge from her mooring; but no tug came and as the storm increased in intensity the master again, at 10:30 o'clock, protested and requested that his barge should be removed to a place of safety, and was again promised that it would be done. It was done that night, but not until after 11 o'clock, and not until after the Doherty had suffered extensive damage from the pounding she had received, and in the act of removing her she was struck a violent blow, which broke her rail. A decree has been entered in favor of the libelants in this case for $1,487.89.

It is said that, when the respondent safely towed the Hercules and the Doherty to their destination at South Amboy and furnished them with a usual mooring place, safe at the time of their mooring, the mutual relations existing between tug and barge ended then and there. Such an argument it is thought finds support in the dissenting opinion in The William Guinan Howard, 252 Fed. 85, 87, 164 C. C. A. 197. But there is a plain distinction between this case and that, as assumed in the dissenting opinion. In these cases the respondent was to take barges to South Amboy, load them with coal, and return them to New York City. The master of the Doherty and the master of the Hercules had nothing whatever to do with the movements of their respective boats from the time when respondent took them in tow until they were returned to New York. The movements of both barges during the whole intervening period were controlled by the respondent alone.

William H. Doherty, who, with his mother owns the Doherty, and whose mother is the owner of the Hercules, and who makes the arrangements with the respondent for taking these boats to South Amboy and for their return to New York with coal, testified as follows on the direct examination:

269 F.—61

"Q. How did you make those arrangements, in order to get these boats down there and back again? A. I simply call up the Pennsylvania towing office and report the boats; I give the name of the boat and the location, where she is lying, and they take it to South Amboy for coal.

"Q. Is that all you have to do from the time the boat is reported until they return to New York? (Objected to.)

"Q. Well, is that all you did on this occasion? A. Yes; that is all I did on this occasion.

"Q. What is the method of paying for the towing of the boats down there and the return to New York? A. That is charged against the bill of lading, and it is deducted out of our freight bill then.

"Q. That is, it eventually comes out of you. It is paid by the Pennsylvania, and deducted from your bill of lading, and is taken out of your freight money? A. Yes.

"Q. Who does the trimming and loading of the boats down at the coal yard? A. The railroad company.

"Q. You have nothing to do with that? A. No, sir.

"Q. Do you have anything to do with the trimming of the boat while she is around the coal docks? A. No, sir; we report her in New York, and that is the last we do with her until she gets back here.

"Q. Until she gets back here? A. Yes."

And on cross-examination he testified as follows:

"Q. Do I understand that in these particular instances of the Doherty and the Hercules that the only thing you did was to telephone the Pennsylvania once that these boats were to be towed to South Amboy? A. Yes.

"Q. And do you mean to say that that is all the information or instruction that you gave to the Pennsylvania until these boats got back? A. Yes; that is all we ever do.

"Q. That is all you ever do? A. Yes.

"Q. Did these two boats come back with coal? A. Yes.

"Q. Whose coal was it? A. I don't remember that right now; I didn't look that up.

"Q. Was it your coal? A. No; we just transport it; that is all.

"Q. You transport coal for the owners of the coal? A. For the owners of the coal.

"Q. Do you mean to say that all you do is to tell the Pennsylvania people that you have a boat that wants to be taken to South Amboy, and they automatically put their coal in that boat and send it back? A. Yes."

[1] Under such circumstances the liability resting upon the respondent would be continuous from the time they were taken in tow at New York until they were returned to New York. If the respondent was negligent in its exercise of ordinary care over the barges during the period of its responsibility it must answer in damages. The dissenting opinion in the Howard Case took the position that at the time the barge went adrift she was not in charge of the corporation held responsible for her injuries. The distinction is vital.

[2] In the ordinary contract of towage, a tug is neither a common carrier nor an insurer. Therefore the highest possible degree of skill and care is not required. But the owners of a tug are bailees for hire. Bust v. Cornell Steamboat Co. (C. C.) 24 Fed. 188; The D. Newcomb (D. C.) 16 Fed. 274; The Merrimac, 17 Fed. Cas. 126, No. 9,478; The Princeton, 19 Fed. Cas. 1342, No. 11,433a, affirmed in 19 Fed. Cas. 1344, No. 11,434. As such they must exercise reasonable skill, care, and diligence in all that relates to the work until it is accomplished. Eastern Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Margaret v. Bliss, 94 U. S. 494, 24 L. Ed. 146; The Printer, 164

Fed. 314, 90 C. C. A. 246. In the instant cases, as the respondent was under contract of bailment to take the barges to South Amboy, to load them there with coal, and to return them so loaded to New York, it is evident that the contract did not end when the boats were moored at South Amboy. The duty to exercise reasonable skill, care, and diligence continued as long as the barges were in the respondent's possession, and the services contracted for remained unperformed.

[3] That the respondent was negligent in the instant cases, and failed to exercise the care which a man of ordinary prudence would use under like conditions, seems to us evident from the record. The negligence appears from the following considerations:

1. In Nicholson v. Erie Railroad Co., 255 Fed. 54, 166 C. C. A. 382, we held it to be some evidence of negligence that the navigators of the respondent paid no attention to the official warnings of the storm which was the cause of the libelant's damages. In the present cases there is such evidence in the record. The man who was in charge for the respondent's wharf at South Amboy, and who said that he could have seen the storm signal which was displayed at Perth Amboy, if he had looked, testified that he did not know whether, on April 5th, a storm signal was displayed or not:

"Q. You didn't pay any attention one way or the other, did you? A. No, because I was busy."

And from 2 o'clock in the afternoon on until 8 o'clock that night, when the storm began, it was evident to the captains of the boats that a bad storm was coming up. It was not until 8 o'clock at night that it broke in full force. The respondent's agents paid no attention to the signals of the Weather Bureau, and they took no notice hours afterwards of the weather indications, which the ordinary seamen had no difficulty in discerning.

2. In the Nicholson Case we also said it was further evidence of negligence that, at a time when danger was imminent, the railroad company did not more swiftly furnish assistance to any boat in its charge. And we held that a delay of two hours in sending a tug to render assistance, when a high wind was known to be injuring vessels in an exposed position, was not excused by anything in the record. In the present case for five hours ordinary seamen foresaw the storm and the respondent had repeated calls for assistance.

3. To leave these boats at the light stakes all the afternoon and early evening, with knowledge that a severe storm was approaching, without removing them, or as many as could be removed, to a place of safety inside the slip, was negligence.

The decrees in both cases are affirmed.

HOUGH, Circuit Judge (dissenting). This is an action for breach of contract, and, if the contract were as stated in the majority opinion, the rest follows as matter of course.

The agreement as found is one for the assumption by respondent of a towboat's liability for the round trip from New York to South Amboy and return, including any and all periods of waiting at the latter place. No such contract is alleged in the libel, and the proof

is of a bargain as familiar in this harbor as is the towboat itself. That the well-known "coal order" long used in forms substantially alike by all the towing lines hauling coal from Raritan Bay and the Arthur Kill to New York, imports an agreement to bring into the shelter of a slip all the boats awaiting loading or towing whenever the weather is bad, is the result of this decision.

To this result I cannot agree—not because I differ as to any point of law stated, but because I do not think any such bargain was ever made.