## BOUCHARD TRANSP. CO., Inc., v. PENNSYLVANIA R. CO.

(Circuit Court of Appeals, Second Circuit. February 9, 1925.)

No. 186.

1. Towage ⟜11(10)—Storm warnings alone do not constitute a test of negligence in New York harbor.

While masters of vessels in New York harbor are chargeable with notice of storm warnings, and they must be taken into consideration, they do not alone require suspension of all work in the harbor, nor constitute an unconditional test of negligence.

2. Towage ⟜11(10)—Leaving a barge with a flotilla tied to a stakeboat held not negligence because of a 30-mile wind.

The leaving of a barge over night with a flotilla tied to a stakeboat in New York harbor, when the velocity of the wind, according to the Weather Bureau, was 30 miles an hour, held not negligence.

3. Towage ⟜15(2)—Evidence held insufficient to establish negligence of tug in not going to assistance of moored barge.

Whether a tug was negligent in not going to the relief of a barge left tied with others to a stakeboat over night, during which time the wind increased to a dangerous velocity, held not determinable on the evidence.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by the Bouchard Transportation Company, Inc., against Pennsylvania Railroad Company. Decree for libelant, and respondent appeals. Reversed and remanded.

William F. Purdy, of New York City, for appellant.

Burlington, Veeder, Masten & Fearey, Chauncey I. Clark, and Thomas H. Middleton, all of New York City, for appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge. The libel was in personam for damages to the scow Grandpa, which occurred while she was in the custody of the respondent to be towed from Ninety-Fourth street in the East River to South Amboy, where she was to obtain a cargo of coal. At about half past 8 in the evening of December 5th the tug Mercer, belonging to respondent, picked up the scow at Ninety-Fourth street and East River and took her to Thirty-First street. After a pause she towed her to the stakeboat Ox, which lies east of Liberty Island in Upper New York Bay, where she arrived at about half past 10. There the Mercer left her with a flotilla of 10 other light scows through the night of the 5th and 6th, and until some time in the afternoon of the 6th. During this time, owing to the battering of the boats upon each other, she sustained certain injuries, which the libel was filed to satisfy. The question was, first, whether it was negligent for the tug to leave her there on the night of the 5th; and, second, at what time, if at all, the respondent was bound to send another tug to her rescue.

[1, 2] The case obviously turns primarily upon the condition of the weather. The hourly wind movement on the 5th, between noon and 11 o'clock, as taken from the top of the Whitehall Building at the southern end of Manhattan Island, varied from 13 miles an hour between 3 to 4 to 29 miles between 9 and 11. The maximum velocity was between 9 and 10, and reached 33 miles at about half past 9. Before the Mercer left the scow, warnings of a southeasterly storm had been raised upon the building. Nevertheless we agree with the learned District Judge in his conclusion that it was not imprudent to leave the barge in the flotilla at half past 10 on that night. On more than

50 days of the year storm signals are raised in the harbor of New York. It is true that masters are chargeable with notice of such warnings (Nicholson v. Erie R. Co., 255 F. 54, 166 C. C. A. 382 [C. C. A. 2]), and are prima facie negligent if they do not see them.

But the fact of a warning is not enough, without more, to constitute negligence. The Golden Rule, 278 F. 1021 (C. C. A. 2). See the unreported opinion below of Hough, J. We cannot agree that all work in the harbor must be suspended, for a day out of each week because the winds will blow. Scows must be staunch enough to withstand weather which is of such frequent occurrence. While, then, we do not, of course, mean to ignore the warnings as a circumstance, we decline to make them singly an absolute test. A wind of no more than 30 miles is perhaps not of itself a peril to a well-found scow. But we need not go so far, and do not. In using the Weather Bureau velocities, one must make some allowance for the place where they are taken. When the tug master and the barges of the Ox swore that at the Ox the wind was no more than 20 miles an hour at 10:30, they may well have been quite within bounds.

The appellant especially relies on our decisions in The May Queen, 298 F. 95, and Doherty v. P. R. Co., 269 F. 959. In the first a tow 1,000 feet long was allowed to swing in the tide while moored to a spile on Pier 54 in the North River. The storm was from the northeast, and when the tug left the flotilla was variously estimated at between 20 and 50 miles an hour, almost certainly greater than when the scow was left in the case at bar. But it was especially the length of the tow, eight or nine tiers, on which we relied. This flotilla was hardly more than half as long. The second case depended not so much upon originally leaving the scow at the South Amboy stake as in neglecting to succor her after the storm had become dangerous.

[3] This leads us, therefore, to a consideration of that question. After midnight the wind began steadily to rise, and at no time between 1 and 7 in the morning had an hourly movement of less than 40 miles, rising in gusts in each hour to at least 48 miles, and reaching at one time 60 miles. It was probably during this period that the greater part of the damage was done. Such a situation imposed on the respondent a duty to relieve the flotilla, which under such conditions must swing in the tide, especially as a loaded flotilla had been placed alongside during the night, which presumably threw the light boats more into the wind. Hence we think, following Doherty v. P. R. Co., supra, that the respondent should have aided the scows. Indeed, the mere fact that 5 of the 11 were damaged shows that the weather had got beyond their reasonable powers of endurance.

The most important fact in the case is, therefore, when such aid could have been given. The only evidence in the record is that of the tug master, who said that when the wind was blowing at 60 miles an hour it would have done more damage to move the scows than to leave them where they were. The wind probably never reached that velocity at the Ox, and the proof is vague on the subject. The tug master's cross-examination did not throw any clear light on the matter. We are thus left in the dark as to the time when it would have profited the scows to have a tug sent to their assistance. Yet we think that, as it was not negligent to leave the Grandpa at the Ox originally, it rests upon the libelant to show when the respondent failed in its subsequent duty. This the record gives us no way to decide.

We can dispose of the case only upon reasonable probabilities. By 7 o'clock in the morning of the 6th the hourly wind movement had fallen to 34 miles, with a highest velocity during the ensuing hour of only 40 miles. We think that during that hour some assistance should have been given. The flotilla had certainly been exposed to conditions which might have done it damage. It was incumbent on the respondent to inquire, and, if necessary, to take the damaged scows away. This it did not do, and it was a fault. The question does not arise of the conclusion of the tug's service, because the scow had not reached her destination.

While it will probably be impossible for the libelant to prove what damage occurred after 7 o'clock in the morning of the 6th, nevertheless it may do so if it can, and the respondent must be charged if it succeeds in carrying the burden. The decree must be reversed, to give the libelant that opportunity, should it think the chance promising enough to justify the effort.

Decree reversed, and cause remanded to the District Court, for further proceedings in conformity with this opinion.