THE HELDERBERG.

MACKAY v. PENNSYLVANIA R. CO. et al.

THE MABEL.

A. J. & J. J. McCOLLUM, Inc., v. PENNSYLVANIA R. CO.

No. 194.

Circuit Court of Appeals, Second Circuit.

Feb. 7, 1938.

650

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for Pennsylvania Railroad Co.

Eggleston & Vander Clute, of New York City (Carl F. Vander Clute, of New York City, of counsel), for A. J. & J. J. McCollum, Inc.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for Rufus Mackay.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals involve two decrees entered upon separate libels in the admiralty, for injuries done to the barges "Mabel" and "Helderberg." The Pennsylvania Railroad had brought the "Helderberg" to the South Amboy "stakes" on the morning of April 4th; the "Mabel" on April 6th; each to await her turn to be loaded at the chutes and towed back to New York; while there, they pounded together in a storm on the morning of the 8th. Mackay, the owner of the "Helderberg," sued the railroad for failing to protect the barge, and the road impleaded A. J. & J. J. McCollum, Inc., the "Mabel's" owner; A. J. & J. J. McCollum, Inc. sued the railroad by a separate libel, for failing to protect the "Mabel." In Mackay's suit the judge held both the railroad and A. J. & J. J. McCollum, Inc. liable; but the McCollum libel he dismissed. The facts were as follows. Dickson & Eddy were coal shippers in New York, buying coal of Sidford & Green; on April fourth they directed the Pennsylvania Railroad to load the barge, "Helderberg," with 500 tons of buckwheat coal. At some time before this, not definitely stated, Mackay called up one, Crowley, a representative of the railroad, told him that the "Helderberg" was at Gowanus, and asked him to tow her to South Amboy; nothing more was said, and the railroad tug took the barge in tow, and delivered her at the "stakes" about noon on the fourth. There was some delay in receiving an order from Sidford & Green, and the "Helderberg" lay at the "stakes" until the eighth. She was moored bows downstream, outside a boat called the "Blue Nose," which lay alongside the "stakes"; outside of her were two other empty barges, one of them, the "McAlister." A. J. & J. J. McCollum, Inc. were themselves in the coal business; on April fourth they called up Crowley, and told him that they wanted the "Mabel" moved from the mouth of the Newtown Creek; again nothing more was said, but it was well understood between them, as in Mackay's case, that she should be towed to South Amboy light, and brought back loaded. The "Mabel" arrived at the "stakes" very early in the morning of the sixth, and an order was received from the shipper to load her at noon on that day. She was made fast, bows upstream, alongside the barge, "Blue Mountain," which in turn lay alongside the "stakes"; there was no barge outside of her. Monday, the eighth, was stormy; between nine and ten the wind reached a maximum of 37 miles; it increased to 47 miles between ten and eleven, to 43 between eleven and twelve, to 48 between twelve and one, after which it began to go down. The "stakes" run approximately northwest and southeast, but, although the wind was in general from the northeast, it must have struck the "Mabel" somewhat on her quarter, for it parted the eye of the line which led from her stern to the "Blue Mountain." This allowed her to surge forward against the line

which held the "Helderberg's" bow to the "Blue Nose"; that line parted, and the "Helderberg," along with the two barges outside her, swung only upon the lines which held her stern to the "Blue Nose." All this happened before noon and no damage was done except for the parting of the fasts. The bargees of the "Mabel" and the "McAlister" went ashore, and asked help of the master of the railroad tug "Canton," which was lying nearby in a sheltered slip, but he did nothing. When the tide changed to ebb, the "Helderberg" and the two other barges swung downstream, and her bow collided with the bow of the "Mabel." They continued to pound, damaging each other, until about five o'clock, when the tug came out, separated them, and put each back in her place. The libels are to recover for the damage done before the tug arrived. The weather had been so severe that at about ten o'clock the tug thought it impossible or imprudent to shift any more barges; but, so far as appears, the seas were never so heavy as to make it too dangerous for her to come out in case of emergency. The judge found the "Mabel" at fault for carrying a rotten line, and held her, together with the railroad, for the damage done to the "Helderberg." He dismissed her libel against the railroad, apparently because her injuries were due in part to her own fault.

■ We have so often held that a tug must take reasonable care of barges in circumstances such as these, that we are a little surprised at the persistency with which the point is still contested. True, before Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, the doctrine had several times been based upon a supposititious bailment; but we tried to make it clear in Thorne, Neale & Co. v. Reading Co., 2 Cir., 87 F.2d 694, that that was not in the least necessary to the result; and we might have added that it did not even tend to support it, for there is as much reason to say that the bailment, if one had existed, would have ended with delivery at the "stakes," as that the towage contract does. The only question is always of the implications of the transaction, taken as a whole. In The William Guinan Howard, 2 Cir., 252 F. 85, no more appeared than that the barges had been towed to the "stakes" and were waiting their turn to be laden; we assumed that that did not end the contract unless the contrary appeared. In Doherty v. Pennsylvania R. R. Co., 2 Cir., 269 F. 959, the testimony—as here—was merely that the owner

asked the road to tow the barge to the Amboys to be filled with coal. Again we assumed that it was to be a round trip, and, although we said incidentally that the barge was in bail, that did not strengthen the conclusion, for the reasons just given. The opinion did indeed assume, as we gather, that the dissent in The William Guinan Howard, supra, 2 Cir., 252 F. 85, had been right and the majority wrong, for otherwise there was no reason to distinguish the decision on the facts, as we professed to do; but we are totally unable to see what distinction there was, and we regard the two cases as holding precisely the same thing. We reaffirmed the doctrine in Harris v. Port Reading R. R., 2 Cir., 45 F.2d 160; and in Re Pennsylvania R. R., 2 Cir., 48 F. 2d 559, 562. So far as New York Trap Rock Co. v. Cornell Steamboat Co., 54 F. 2d 812, D.C., S.D. N.Y. rests upon a ruling that a barge sent to a stakeboat maintained by a towing company, is not yet delivered under the contract, we must reserve our approval until the question comes before us for decision; Bouchard Transp. Co. v. Pennsylvania R. R., 2 Cir., 6 F.2d 362, did not so decide. We do not, of course, say that there may not be arrangements under which the tug is discharged from liability, or that the barges may not be at the "stakes" merely as licensees after the towing contract has come to an end; but that is not the ordinary understanding.

■ The situation at bar was perhaps not such as called for affirmative action by the tug before the visit of the bargees, but after they had asked help, it should have been given, and it did not matter that the "Helderberg's" bargee did not go along with them himself. The visit was certainly after the "Mabel's" line parted, if it was made at all; the testimony of the "Helderberg's" bargee that it was before, should not prevail against that of the two who went; indeed, there was no occasion for help till then. The judge believed the bargees' story that they did go, and we accept his finding; the master of the "Canton" was not called to contradict them; and while he was in the hospital, it does not appear that he could not have been examined. We also accept the finding that the first cause of the accident was that the "Mabel's" line was rotten; nevertheless, she should not be charged. If the tug had been under no duty to assist unless the barges were well found, then no doubt she should be charged; but a tower's engagement includes the pro-

tection of barges with bad gear as well as with good; and the "Mabel's" fault—the breaking of her rotten line—was precisely one of those occasions whose consequences the tug had undertaken to correct, unless correction involved unreasonable exertions, which it did not. In her own suit this results in full damages, and in Mackay's suit, although possibly she may be liable on the theory that she should have foreseen the possible failure of the tug, any damages she might have to pay, are on the same footing as physical injury to her hull; they are a loss occasioned by a fault, which the tug was bound to make harmless. Any secondary liability in the event that the road could not respond, is of merely academic interest and may be ignored.

Decree in the Mackay suit modified to hold only the Pennsylvania Railroad Co.

Decree in the McCollum suit reversed and decree entered for the libellant.