**NEW YORK TRAP ROCK CORPORATION v. CHRISTIE SCOW CORPORATION et al.**

**No. 215, Docket 20519.**

Circuit Court of Appeals, Second Circuit.
July 2, 1947.

Chauncey I. Clark and Burlingham, Veeder, Clark & Hupper, all of New York City (Stanley R. Wright, of New York City, of counsel), for appellant.

John P. Carson and Reginald V. Spell, both of New York City, for Christie Scow Corporation.

Gerald J. McKernan and Macklin, Brown, Lenahan & Speer, all of New York City, for A. A. Stevedoring Co.

Henry C. Eidenbach and Hagen & Eidenbach, all of New York City, for libellant.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The Moran Towing Company appeals from an interlocutory decree in the admiralty, holding it primarily liable, and the Christie Scow Company, secondarily liable, for the sinking of the scow, "Tallaksen," in the New York Harbor on January 24, 1945, during a storm. The Christie Corporation has filed assignments of error; as has the libellant because of the judge's failure to hold the Christie Scow Corporation primarily liable, and because of his exoneration of the A. A. Stevedoring Company. The Moran Company laid the scow outside a ship, moored at Pier 54, Brooklyn, which runs northwest and southeast at the Bush Docks, and the storm which sank the scow was a heavy blow from the northwest. The scow had been partially loaded with the ballast taken out of the ship; one of her hatch covers was off, and the seas which broke over her stern (she was moored stern out) filled her.

The facts on which the case turns were as follows—most of them having been found by the judge. The libellant, the owner of the scow, on December 30, 1944, chartered her with a bargee to the Christie Company at an agreed per diem rate. Like many other scows of a similar kind, she was being used to take away sand and gravel discharged from ships which came back in ballast from Europe, and were to be laden with war materials upon their return. The Christie Company had been in the habit for some time past of chartering such scows to the Moran Company, which used them under contracts with the ships to carry away and dump the sand and gravel. The Moran Company had, however, become dissatisfied with this arrangement, because it was subjected to the full liability of a charterer, if anything went wrong. Therefore, its manager, Moran, told Lynch of the Christie Com-

pany that it would not continue; and late in the year, 1944, it was agreed that the Christie Company should do the "transportation" and the Moran Company "all the other work, furnishing the necessary tugs, arranging for the towing, finding places for the ballast to be disposed of, but the actual management of the scow was to be taken care of by Christie Scow Corporation." This, as Moran said, "was to relieve Moran of the liability for damage to the scows which he had under a charterer's liability"; and in return for this release he paid a higher hire. We have stated the contract in the language of Moran; Lynch's version is a little different, and the judge did not make any finding beyond saying in his opinion that it was "plain enough that Moran would be liable if negligent in failing to use reasonable care to place the scow or leave her in a berth reasonably safe." We are not clear whether this was more than a statement of the judge's understanding of the liability imposed by law upon the Moran Company under Moran's version; or whether we should take it as a finding that he believed Lynch when he said that the agreement was that "we would move ballast, and that is all we would do. They would handle all towing, overtime, wharfage. They would place the boats wherever they wanted to, and unload them wherever they wanted to. All we were to do * * * was to supply them with a scow in order to do the transportation." It so chances that we agree that, even under Moran's version, its liability was what the judge found; nevertheless, our labors would have been lightened, had he found the actual terms of the contract. Johnson, Moran's tug dispatcher, construed the contract in accordance with the judge's opinion. He testified that, in case a Christie scow were in any danger he "would ask the tug dispatcher to send a tug down there to see if they could help to move the scow"; and again, that, if he had known that small craft storm warnings had been hoisted in New York on the 22nd—as was the fact—he would not have sent the scow to the berth, for he had heard that the

Bush Docks were a bad place in a northwest wind.

On January 23, 1945, the Moran Company towed the scow to the foot of 54th Street, Brooklyn, and placed her alongside a steamship then moored on the north side of the pier. The A. A. Stevedoring Company began discharging the sand and gravel from the ship through the No. 4 hatch of the scow, and this continued throughout the 23rd, by which time two hundred tons had been taken off. On the morning of the 24th, the stevedore moved the scow alongside Nos. 2 and 3 hatches, and discharged more ballast; but in the early afternoon of that day it began to blow so hard from the northwest that the work had to be discontinued. The wind movement recorded by the Weather Bureau for the first hour of the afternoon was forty-two miles, and it rose to fifty between three and four, with maximums meanwhile of fifty-six; blowing directly into the slip. The temperature was below freezing all day on the 24th; the stern of the scow was covered with ice, and all the lines were frozen stiff. The stern hatch had been left open, but the stevedore attempted to close it by letting down one of their number, who was, however, unable to put it in place. The bargee, fearing for his safety, left the scow about five o'clock in the afternoon, and called up the libellant to tell of the situation. He then boarded a nearby scow and stayed there until his scow sank at about nine o'clock. Meanwhile, during the afternoon the Christie Company learned of the scow's plight from the libellant, which had telephoned to it twice—once at three-thirty, and again at five o'clock. The Christie Company passed on the information to the Moran Company; and received from Johnson the assurance that he "had two tugs on the way down there, and that they would take care of both the 'Brannan,' and the 'Tallaksen,'" the exposed scows. However, by the time the first of these neared the slip, the weather had become so bad that nothing could be done.

After some vacillation in the lower courts—as we showed in The White

City[1]—the Supreme Court definitively decided in Stevens v. The White City,[2] that the doctrine that a contract of towage does not put the tow in bail to the tug, extends to cases where the tow is an unmanned scow or barge, and a fortiori where a bargee is on board. It cannot be doubted therefore that in the case at bar the Moran Company did succeed in its purpose of avoiding the liability of a bailee by the change in its relations to the Christie Company at the end of 1944. It does not follow, however, that in all cases a tug is exonerated from all care for her tow after she had delivered it at some intermediate place whence she means to remove it; or for that matter at the terminus of the voyage. That she is not we first held, over a strong dissent by Hough, J., in The William Guinan Howard,[3] a dissent which he repeated in Dougherty v. Pennsylvania R. Co.;[4] and it is now well settled law. The degree of care assumed by the tug in such cases depends upon the contract, which usually must be gathered by reconstructing the relations between the parties in their entirety. We see no reason for repeating what we said in Thorne, Neale & Co. v. Reading Co.,[5] and The Helderberg,[6] especially after our recent reaffirmation of these decisions in The Tillie S.[7] In the case at bar it seems to us plain that the Moran Company made itself responsible for care of the scow where she lay, in case a storm arose of any such violence as that of January 24th. The Christie Company had no command over the goings and comings of the scows, once they were put at the disposal of the Moran Company. Its bargees might perhaps keep it informed of their whereabouts, though even that is doubtful; but that information, if received, ought not, we think, have imposed upon it any duty to intervene. Where a scow should go; how long it should stay where it was put; when and with what it should be laden— subject to the bargee's power to prevent overloading—; where it should be taken; when it should be next used and where: all these decisions rested altogether with the Moran Company. The Christie Company could not intervene in these matters without invading the control which it had granted; and the Moran Company had interests of its own which it could not protect, if it was subject to interruption. No doubt the occasion might be such as to justify intervention; but that could arrive only after the Moran Company had so far neglected its interests and the scow's— which were in this respect one—as to prove that it had been at fault. As we said in Thorne, Neale & Co. v. Reading Co., supra, 87 F.2d at page 697:[8] "Having by implication the power to suit their convenience in loading and returning the boats, the roads are under the correlative duty to mind them while they are there * * *." Furthermore it must not be forgotten that, not only was this the practical construction put upon the contract by Johnson, upon the occasion in question; but, as has appeared, it was certainly the interpretation that he personally thought right.

Nor does this trench upon the Moran Company's purpose in modifying the earlier arrangement in 1944. It does not impose upon that company the liability of a charterer: i.e. a prima facie liability for all damage, and an absolute liability for the negligence of any third person to whom the charterer may entrust the vessel. In the words of Lynch, the Moran Company was "concerned, about damage claims, unknown damages—damages that happened with no known causes to them * * * damage that might happen during the night * * * and nobody knew how it happened. * * * That is the only liability we discussed at the time." This Moran did not deny and indeed his own testimony rather accords with it: "The purpose * * * was to relieve Moran of the liability for damage to the scows which it had under a charterer's liability." At least this is not language adequate to describe a release from liability for neglect

---

[1] 2 Cir., 48 F.2d 557.

[2] 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

[3] 2 Cir., 252 F. 85.

[4] 2 Cir., 269 F. 959.

[5] 2 Cir., 87 F.2d 694.

[6] 2 Cir., 94 F.2d 649.

[7] 2 Cir., 123 F.2d 899.

[8] 2 Cir., 87 F.2d 694.

to protect the scows from known dangers, if the contract otherwise imposed one.

It is not necessary to deal at length with the errors assigned by the other parties. Plainly the Christie Company, as bailee of the libellant, was liable secondarily for the Moran Company's neglect. The stevedores did all that was humanly possible after the storm arose, and were not charged with any duty to move the scow away from the slip. It is absurd to suggest that the sinking was inevitable.

Decree affirmed.