**NEW YORK TRAP ROCK CORPORATION v. CHRISTIE SCOW CORPORA-TION et al.**

**THE FRANK C. MERTZ.**

**THE GERD HENJES.**

United States District Court
S. D. New York.

Oct. 6, 1949.

Hagen & Eidenbach, New York City, Henry C. Eidenbach, and David A. Kraemer, New York City, for libellant.

Mahar & Mason, New York City, Anthony J. Randolph, New York City, for respondent Christie Scow Corporation.

Macklin, Brown Lenahan & Speer, New York City, Richard F. Lenahan, New York

City, for respondents-impleaded Moran Towing Corporation and Moran Towing & Transportation Co., Inc.

Purdy, Lamb & Catoggio, New York City, Edmund F. Lamb, New York City, for Henjes Marine, Inc. and Gerd Henjes, impleaded.

John F. X. McGohey, United States Attorney, New York City, Frank P. Cox, Astoria, L. I., N. Y. and Louis E. Greco, New York City, for respondent-impleaded Boyd, Weir & Sewell, Inc.

Hill, Rivkins & Middleton, New York City, Eugene P. McCue and Joseph T. McGowan, New York City for respondent-impleaded Turner & Blanchard, Inc.

BONDY, District Judge.

This is a suit brought to recover for damages sustained by the pounding of the scow Frank C. Mertz against the end of Pier 3, Staten Island, during the night of January 3, 1944.

The libellant New York Trap Rock Corporation, the owner of the scow, brought this suit against Christie Scow Corporation to whom it had chartered the scow in good and seaworthy condition. Christie Scow Corporation impleaded Moran Towing Corporation to which it had subchartered the scow. Moran Towing Corporation impleaded the tug Gerd Henjes which towed the scow from Pier 14 to Pier 3, Staten Island. Henjes Marine, Inc., the claimant of the tug, impleaded the Moran Towing & Transportation Company, Inc., which had ordered the tug, which it had under charter, to tow the scow alongside the S. S. Samdak on the north side of Pier 3, Staten Island, and Boyd, Weir & Sewell, Inc., which had given the order for the scow to Moran Towing Corporation. Boyd, Weir & Sewell, Inc., impleaded Turner & Blanchard, Inc., the stevedore at Piers 2, 3 and 4, which had an office on Pier 3 and one of whose longshoremen, it is alleged, on that day acted as harbor-master on a shifting tug working at the piers.

On January 3, the general manager of Boyd, Weir & Sewell, Inc., telephoned the Moran Towing Corporation for a scow to be placed alongside the Samdak on the north side of Pier 3 at or before 8:00 A. M. on the morning of January 4, 1944. Moran Towing Corporation relayed the order to the Moran Towing & Transportation Company which thereupon ordered the tug Gerd Henjes to tow the scow alongside the Samdak. The Gerd Henjes towed the scow and at about 5:30 in the afternoon of January 3rd tied it to the exposed end of Pier 3, where the damage was sustained. At that time the wind was from the northeast and ranged from 14 to 16 miles per hour and storm warning had been given. By midnight the wind reached an average of almost 29 miles per hour and for five minutes at midnight about 35 miles per hour.

The captain of the towing tug Gerd Henjes testified that he received instructions to take the scow from Pier 14 to Pier 3 Staten Island, that when he approached Pier 3 one of three men on the shifting tug, Timothy D. Sullivan of the Carroll Line, who said that he was the harbormaster stopped him from going alongside the Samdak in the slip between Piers 2 and 3 and told him to put the scow at the end of Pier 3 and promised that he would take care of the scow; that he (the captain of the towing tug) replied that he would not be responsible for the scow at the end of the pier, that he had orders to put it alongside the Samdak in the slip, that after tying the scow to the pier he telephoned Moran's dispatcher (who died before the trial was reached) and told him that he had landed the scow at the end of the pier, that he was not allowed to enter the slip with the scow and that he would not be responsible for leaving the scow there on account of the weather conditions; that the dispatcher replied "If that is your harbor-master's order there is nothing I can do about it. You will have to leave it."; that he thereafter told the scow captain that he did not think that the scow would be safe there during the night, and that the captain of the scow told him that he had already spoken to the shifting tug which had promised to take care of the scow in a little while. The captain of the Gerd Henjes further testified that he was apprehensive because the wind which began to blow in the morning from

northeast was steadily increasing in force and that he did not believe that the pier end was a safe place for the scow to remain over night.

The captain of the scow testified that he did not see any shifting tug, that he did not hear any instructions given to the captain of the towing tug which left immediately after tying the scow to the pier end, that the wind began to blow stronger about 8:00 P. M. and that, notwithstanding that he doubled some of the lines and used an extra line, the scow broke loose (apparently after sustaining the damage), and drifted about 200 feet before it was picked up and returned to its former position at the end of the pier.

The testimony is irreconcilably conflicting as to whether the Gerd Henjes tied the scow to the end of the pier and left it there without any instructions from any harbor-master or whether some harbor-master, or a harbor-master in the employ of Turner & Blanchard, Inc., prevented the Gerd Henjes with the scow alongside from entering the slip, ordered it to be placed alongside the exposed pier end and promised to take care of it.

Witnesses called on behalf of Turner & Blanchard, Inc., testified that when the Gerd Henjes with the scow approached Pier 3, there were not any tugs shifting lighters at the piers, that none of the employees of Turner & Blanchard, Inc., were working as harbor-master or longshoremen and that its records disclose that not any charge was made to any one for such service.

On the other hand, witnesses called on behalf of other respondents testified that Boyd, Weir & Sewell, Inc., berth agent for the Bank Line, lessee and berth operator of the pier, never had in its employ any stevedores, harbor-masters or other workers on Pier 3 in January, 1944 or at any other time; that Boyd, Weir & Sewell, Inc., were interested only in cargoes and not in ships and that Turner & Blanchard, Inc., was in charge of the loading and unloading of cargoes on Piers 2, 3, and 4 and in charge of the shifting of lighters around the piers and that Turner & Blanchard, Inc., always engaged the Carroll Towing Company to do the shifting of lighters and that no stevedores other than Turner & Blanchard, Inc., ever were engaged or interested in the shifting tugs or in the shifting of lighters and that no one other than Turner & Blanchard, Inc., supplied harbor-masters at these piers.

The captain of the shifting tug, Timothy D. Sullivan, testified that his tug did shift lighters at Pier 3 from 3:45 to 5:45 or 6:00 o'clock on January 3 and that there was a harbor-master aboard the tug.

Joseph F. Carroll, vice-president of the Carroll Towing Company, testified that in the afternoon of January 3rd a tug was ordered for shifting at Pier 3 and that the Timothy D. Sullivan worked from 3:30 to 6:00 P. M. and that there must have been a harbor-master aboard, otherwise there would have been an extra charge for deck hands on the tug for handling the lines.

The superintendent stevedore in the employ of Turner & Blanchard, Inc., stated in a letter which was signed by him and produced at the trial that there was a tug shifting at the piers that afternoon and on cross-examination stated that it was the Timothy D. Sullivan.

In view of the fact that longshoremen generally act as harbor-masters; that the Carroll Towing Company always was employed to do the shifting at Pier 3; that the vice-president of the Carroll Towing Company testified that the shifting tug was sent to Pier 3 and that Turner & Blanchard, Inc., always appointed the harbor-masters who instructed the captains of the tugs where to place lighters; that the captain of the Timothy D. Sullivan testified that he shifted tugs during the afternoon of January 3rd and that there was a harbor-master aboard, and that the superintendent of Turner & Blanchard, Inc., admitted that the Timothy D. Sullivan did shift tugs at the piers that afternoon, the court believes that a harbor-master in the employ of Turner & Blanchard, Inc., stopped the Gerd Henjes from placing the scow in the slip and instructed the tug to place the scow at the exposed end of Pier 3 and promised that he would take care of it.

The order to place the scow at the exposed end of the pier and the failure to

992

remove it from there in view of the existing weather conditions constituted negligence on the part of Turner & Blanchard's harbor-master which resulted in damage to the scow. See C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d 562; The Everett Fowler, 2 Cir., 151 F.2d 662; The Eastchester, 2 Cir., 20 F.2d 357; Mackenzie v. McAllister Lighterage Line, Inc. and United States, 1942 A.M.C. 1215.

A harbor-master with authority to direct the placing of lighters by a shifting tug has the authority to direct a towing tug where to place her tow.

It therefore appears that it was not negligent under the circumstances for the captain of the Gerd Henjes and for Moran Towing and Transportation Company to follow the order and rely on the promise of the harbor-master. By giving the order and making the promise he accepted delivery of the scow, and the duty to care for it and if necessary to shift it to a safer berth was his and not theirs. See C. F. Harms Co. v. Erie R. Co.; The Everett Fowler; The Eastchester; Mackenzie v. United States, supra.

It is contended that in the exercise of reasonable care the scow captain should have called for assistance. See The Everett Fowler, supra, 151 F.2d at page 664; Burns Bros. No. 73, 1938 A.M.C. 383. There has been no proof that a call for assistance either to Moran Towing and Transportation Company or to Turner & Blanchard, Inc., or to the libellant would have brought any assistance. There is therefore a failure of proof that the intervening negligence of the barge captain caused or contributed to the damage. The B. B. No. 21, 2 Cir., 54 F.2d 532, 534.

There was not any proof that any negligence on the part of Christie Scow Corporation, Moran Towing Corporation or Boyd, Weir & Sewell caused or contributed to the damage. The first two, however, as charterer and subcharterer are secondarily liable for the negligence of those to whom the scow was entrusted. O'Donnell Transportation Company v. M. & J. Tracy, 2 Cir., 150 F.2d 735; Seaboard Sand & Gravel Corp. v. Moran Towing Corp., 2 Cir., 154 F.2d 399. Neither the Gerd Henjes nor Moran Towing and Transportation Company are subject to such secondary liability because tugs and towing companies are not bailees of the vessels they tow. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; New York Trap Rock Corporation v. Christie Scow Corp., 2 Cir., 162 F. 2d 624, 626.

Accordingly a decree should be entered dismissing the petitions against Moran Towing and Transportation Company, the tug Gerd Henjes and Henjes Marine, Inc., and Boyd, Weir & Sewell, and imposing primary liability for the damage on Turner & Blanchard, Inc., and secondary liability on Christie Scow Corporation and Moran Towing Corporation.