## LYNCH v. THE EDWARD S. ATWOOD et al.

### THE SEABOARD NO. 20.

### THE COMRADE.

### THE ABIQUA.

No. A–17048.

United States District Court
E. D. New York.
Feb. 25, 1949.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, and Edward J. Ryan, of Rochester, N. Y., of counsel), for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for The Edward S. Atwood and Agwilines, Inc.

Haight, Griffin, Deming & Gardner, of New York City (Henry M. Hewitt, of New York City, of counsel), for claimant Merritt-Chapman & Scott Corporation.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curren, Sp. Asst. U. S. Atty., of counsel), for the United States.

BYERS, District Judge.

This is a scow damage cause in which it must be deemed to have been shown that libellant's wooden scow Seaboard No. 20 was squeezed between the derrick Comrade and the north side of Pier 36 N.R. on January 13, 1944, at approximately 5:45 P.M., Eastern War Time.

Puzzling questions of both fact and law are presented by the pleadings and the evidence. ·

The scow sank, decks to, at Pier 34, about an hour or less after she had been towed from the slip between Piers 37 and 36, as the result of taking water through bottom planks which had been started away from her bilge log, on the starboard side in the vicinity of bays 3, 4 and 5.

The scow had carried two airplanes and two boxes (containing wing assemblies) from Port Newark to Pier 40 N.R. on January 12, 1944, and was handled thereafter by the claimant-respondent's tug Edward S. Atwood on the morning of the next day; that is, she was towed from Pier 40 to a berth in the slip between Piers 37 and 36 and placed near the bulkhead on the north side of Pier 36, awaiting discharge.

To accomplish that, she was hauled into position alongside the derrick Comrade, at a little after 5:00 P.M., E.W.T., the latter being held by lines alongside the tanker Abiqua, which lay bow in on the south side of Pier 37.

The slip is 150 feet wide, and when all vessels were in the position stated, their combined widths were: (Abiqua 68.2 feet overall; Comrade 34.9 feet, and Seaboard No. 20 34.5 feet) 137.6 feet.

This left an apparent margin of about 12 feet to accommodate the spaces necessarily present between all vessels and both Piers.

The space on the port side of the Abiqua would be affected by tidal movement, and perhaps by the northwest wind which prevailed, of from 25 to 34 miles an hour.

When the Seaboard No. 20 was landed alongside the Comrade, the testimony is that there was from 3 to 4 feet of open water between her and Pier 36. When the discharge of her cargo had been completed, by the operation of the boom on the Comrade which hoisted the planes and boxes from the scow and swung them to the deck of the tanker, the tug put a line on the scow and tried to tow her out of the slip; this was impossible, because by then she was held in a jam against the north side of Pier 36. Then the tug bumped her forward toward the bulkhead by two or three head-on movements, and so broke the jam; a little later the tug towed the scow to the south side of Pier 34, where she sank to the extent stated. So much is undisputed.

It should be added that there was some floating ice in the river, which could be regarded as an unrelated fact, except for the eccentric course of this litigation.

A survey of the scow's damage was held on January 18, 1944, attended by surveyors called by all interests involved, and the reports show generally side plank damage on both sides in the vicinity of bays 3, 4 and 5, and two bottom planks broken "by ramming starboard side bay #2", and three bottom planks started away from bilge log.

Apparently it was this damage which caused the leaking and filling, according to the surveyor representing libellant's interests, which therefore was her information as of January 20, 1944.

On April 10, 1944, a libel was filed against the Atwood, alleging that the scow was damaged while being shifted from the north side of Pier 35 (sic) "through heavy ice * * * whereby she filled and sank".

The faults alleged were towing alongside through ice; forcing the scow through ice; "forcing the tug through the side of the scow"; and pushing in and breaking the side planks.

The tug was claimed on May 15th and on September 1, 1944, an answer was filed, which alleged that the Atwood shifted the scow on the afternoon in question to the south side of Pier 34 in a safe and proper manner, and that no damage was occasioned thereby, although there was a small quantity of floating ice in the river.

Over two years elapsed without further action, and then on April 15, 1946, an amended libel was filed against the tug and Agwilines, Inc., owner respondent, setting forth that the scow on the date in question was moved alongside the Comrade for transfer of cargo to the Abiqua, and that the former's starboard side was "close to the north side of Pier 35" (sic); that the scowman protested against such placing, and that the Comrade proceeded to transfer the cargo of airplanes from the scow to the ship, "and in doing so squeezed the 'Seaboard No. 20'". Thereafter the tug towed the scow to the south side of Pier 34, through ice.

That the Atwood was the bailee of the scow for the purpose of transferring her cargo and removing her "from alongside the S. S. 'Abaque' (sic) thereafter".

The charges of negligence are that the tug caused and allowed the scow to be placed in a position alongside the Comrade where she became damaged, and that she caused the scow to be towed through ice in such a manner that she became damaged.

Thus after an opportunity to ascertain the facts during a period of over two years, the libellant still seemed to believe that the Comrade did the squeezing, and that the tug was responsible for the damage for placing the scow alongside, and also caused the damage by towing through ice, which seems to mean that the libellant was not even then satisfied in her own mind as to how the damage was caused.

In March of the following year an answer to the amended libel was filed, denying the bailment, the negligence, and the making of protest by the scowman. Fault, if any, is attributed to the scow, the Comrade, and the Abiqua, in permitting the scow to become wedged between the Comrade and Pier 36. An impleading petition under Rule 56 was filed against the Comrade and the United States of America as owner of the Abiqua, under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., in rem and in personam.

The faults alleged as to the Comrade were: Failure properly to handle her lines; failure to maintain fenders between her hull and the scow; permitting the scow to become wedged and squeezed as stated.

The faults attributed to the Abiqua were: Failure properly to handle the lines, in that she was caused or permitted to breast off from the Pier (37) and squeezed the scow as stated.

Answers to the impleading petition were filed, and as to the Comrade laches was the main defense, namely, a delay of more than three years after the alleged damage before the claimant of the Comrade had knowledge of the claim. The Government's answer denied all material allegations of the impleading petition, particularly the breasting off of the Abiqua as alleged; lack of jurisdiction was asserted by reason of the lapse of more than two years after the alleged damage of the scow (Suits in Admiralty Act) and also because neither the respondent nor the Abiqua was within the jurisdiction of this Court; also that the operation of the derrick Comrade and the shifting of vessels delivering cargo were under the supervision, direction and control of the respondent Agwilines, Inc.; also laches on the part of both libellant and respondent.

The respondent's pleadings were amended later to assert laches on the part of libellant, and at the trial to plead the berth

agency agreement under which the Atwood was functioning at this time and place. The motion to amend in that respect was opposed and decision was reserved at the trial, but the motion is now deemed to have been granted in order that all issues may be disposed of on the merits.

It will be convenient to take up the questions in this order:

*Libellant's proof as to cause of damage:*

The scowman (Axinger) was called and proved to be less than satisfactory as a witness, since he was being examined after the lapse of nearly five years from the sinking. He was 71 years of age at the time of trial, and said he had made a statement to his owner within a very few days after the sinking, but it was not shown to him to refresh his memory.

That statement would have been helpful to the Court for obvious reasons.

His testimony is clearly to the effect that the Comrade in tilting had no room; "he drives all the way on my side and he loosened my bottom planks"; although he talked to no one while the planes were being transferred except to Totland (harbor master for Agwilines) which apparently was later. This version is changed when still later he said that he talked to the Chapman gang thus: "Listen, you better take that plane off me now and put it on your deck. I am leaking."

He said he found the leak when he went below to get some wood, after the first plane was off.

He does not mention the jamming against Pier 36 at the time his scow was removed from alongside the Comrade, which Murphy, the captain of the Atwood, described. He does say that 4½ to 5 feet of water was in the hull of the scow when she was hauled to Pier 34.

He says flatly that he did not protest his berth alongside the Comrade when he was first landed there. Also that the damage was not due to ice but to squeezing.

Finally, that he discovered the leaking when the scow had been taken to Pier 34.

The only fact witness for libellant, therefore, attributed the damage to the operation of the derrick, which apparently he thought produced the squeeze, although he also said: "I guess the tide changed. The tide is going out and I went up against the dock and all the rest followed me." Again: "The tide went out, a strong tide, and the tanker goes down and the lines get slack and he moved away from the dock."

It is indeed difficult to understand how the original libel could have alleged ice damage, in light of the foregoing. Moreover, the concluding excerpt shows that the libellant's only witness attributed the squeezing—at least in part—to the sagging on her lines, by the Abiqua. A timely assertion of that theory of damage could therefore have been made well prior to April 15, 1946, when the amended libel was filed.

Nor is it clear how the Atwood could be held at fault for landing the scow alongside the Comrade, in the absence of testimony to the effect that such a position was hazardous at the time. As to that, Axinger is completely unreliable, for he says in effect, though not precisely, that the scow lay alongside the Comrade from the time she was towed from Pier 40 to this slip, which would be most of the day, and never was berthed inshore at the north side of Pier 36 prior to the actual discharge of her cargo. In addition to being manifestly improbable in light of the character of the common task, it is contradicted by other evidence in the case which is compelling as to this question.

The scow was not able to choose her own berth, of course, and had to rely upon proper shifting, and if that was not accorded, too fine a line should not be drawn between the testimony elicited for her, and the actual events as nearly as they can be spelled out; however, she was not unattended, since both the captain and a man whom he describes as a guard, were on board during all of this day, and the former says he made no protest at being landed alongside the Comrade.

Mr. Hansen, a surveyor called by libellant, gave it as his opinion that, under the circumstances shown, the damage to the scow was the result of the operation of the derrick. This means that the dipping or rolling of the Comrade in obedience to the

swing of the boom from the scow to the tanker was the effective cause of the breaking of the side planks and the starting of the bottom planks.

It was not due, in his opinion, to jamming the scow through a narrow place (i. e. the breaking of the jam as described).

His later testimony seems to be to the effect that, if the tanker breasted away from her Pier, her weight would have been borne to some extent by the Comrade, and this would have contributed to the squeezing.

■ This summary of the libellant's testimony shows that ice damage seems not to be relied upon, despite proctors' somewhat equivocal opening (p. 8), but that squeezing is stated to be the cause. But whether that is attributed solely to the operation of the derrick, or to the breasting off by the Abiqua, is not so clear. The alleged failure of the Atwood to perform her duties would seem to depend upon whether she could reasonably be expected to foresee one or the other of those conditions, and if the latter, whether it should not have been asserted within less than two years after the occurrence.

*Has fault been shown on the part of the Comrade?*

■ The answer to this question is a simple negative. She was placed alongside the tanker in a proper position to handle planes from scows drawn alongside her, and the evidence is that she put out sufficient rope fenders on both sides to prevent rubbing, and in all respects functioned adequately and as expected. No one asserts that her boom could swing outboard, first on one side and then the other, without causing her sides to rise and dip, or that she did so in this operation unduly or in an unpredictable manner. Nor is there any criticism found in the record touching her handling in any respect. In other words, the impleading petition is unsupported, and must be deemed to have failed of proof.

*The legal relationship between the Atwood and the scow:*

This subject involves the legal status of Agwilines as berth agent (sub-agent really) or as terminal agent, in handling the scow.

This may be a convenient place to state more in detail the legal aspects of the entire situation:

1. The planes and boxes belonged to the Army, and were delivered for its account on board the scow, which was berthed at Pier 40, on January 12, 1944.

2. Agwilines was berth agent (i. e. sub-agent) of the tanker Abiqua for the United States pursuant to Berth Agency Service Agreement (Agwi Ex. 3) dated January 1, 1944. For present purposes, the Agent was appointed "to conduct the business of the vessels assigned to it from time to time", and the Abiqua was so assigned. There are certain provisions of that contract, later to be referred to, which are drawn into controversy.

3. Cities Service Oil Company was the General Agent of the Abiqua, and Agwilines is called sub-agent. For present purposes, there is no difference, and they are here treated as the same thing.

4. Agwilines also had a separate contract with the Government (U. S. Ex. 2), called Terminal Operating Agreement, whereby it was engaged as an independent contractor to do and perform "all the duties and functions of a terminal operator * * * with respect to such cargo and vessels as the Administrator may from time to time direct or designate, and at the following terminals: Piers 34 and 36, North River".

Operator warrants it is the lessee of the specified terminals. Among other duties agreed to be performed are, to receive, deliver and handle cargo; shift lighters, barges, scows, etc., and load and discharge them.

The operator assumes responsibility for loss, damage or injury to persons or property "arising through the negligence or fault of the operator, its employees. * * *"; paragraph 6(a) is the important one in this connection.

It is the Government's position that Agwilines was acting in this instance under its contract as Terminal Operator, and not as Berth Agent of the Abiqua.

Whether this is an important distinction is not too clear in light of paragraph (c) of Article 15 of the Berth Agency agree-

ment, which provides that if the Agent "shall perform any stevedoring, terminal, or similar service for the vessels hereunder (i. e. Abiqua) at commercial rates, the Berth Agent shall have all the obligations and responsibilities of the person performing such service under the standard or other approved form of contract with the United States or, in the absence of such standard or approved form, under usual commercial practice."

The foregoing applied only if the Atwood performed its present service at commercial rates. That phrase is not explained in the testimony (perhaps it means "at the cost of a consignor").

The position of the Government, as stated in the record (p. 251), is that Agwilines was acting as Berth Agent in dealing with the Abiqua "but not in dealing with these planes * * *. We have got nothing to do with that any more than we do with anybody else on the outside delivering cargo to a ship."

■ The subject is now being referred to solely in respect to the relationship between the scow and the Atwood, and the distinction, if any, will not now be pursued beyond the requirement of "reconstructing the relations between the parties in their entirety". New York Trap Rock Corporation v. Christie Scow Corporation, 2 Cir., 162 F.2d 624, at page 627.

The Atwood moved the scow from Pier 40 at about 7:30 A.M. January 14th and placed her in the slip on the north side of Pier 36, where she lay properly moored, pending her discharge alongside the derrick. So much is clear from the testimony of Murphy, the Atwood's captain, and Totland, the harbor master of Agwilines. It was their job to see that she was safely landed at the derrick, and this they performed at about 5:00 P.M., at which time she was properly made fast to the derrick, the lines being handled by Totland. The berth was safe since there was open water of from 3 to 4 feet between her starboard side and Pier 36 at that time.

■ Clearly there was no contract for towing entered into between the libellant and Agwilines; clearly, however, the lat-ter—acting under instructions from the Government and on its behalf—took the scow into custody and must be held to have rested under the duty of exercising reasonable care to protect her from injury from any source until the owner or charterer should resume possession.

It seems unnecessary to characterize this relationship as sufficiently contractual in nature to give rise to a claim under the Tucker Act [28 U.S.C.A. § 1346], as in C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d 562.

Nor is it needed to go so far as to assert that the Atwood became an insurer of the scow.

■ Certainly the latter could look to the Atwood for protection against the tug's own neglect. To what extent, however, the Atwood was required to see to it that the Abiqua should not by act or omission endanger the safety of the scow in the position in which the Atwood had placed her, is probably the heart of the libellant's cause.

Clearly no such duty would have arisen, had the Abiqua been a private vessel lying in a privately owned slip, and had the Atwood been a privately owned independent tug, employed by the owners of the scow to do a towing job to and from this Pier.

Since there is no question here of a foul berth, the second element may be disregarded. As to the first, the Abiqua was a Government owned ship, and as to her the Atwood occupied a special relationship under the Berth Agency (Sub-Agency) Agreement.

Since the Government apparently could direct the Atwood to function under either of the two contracts in evidence, it is important to ascertain which one was actually called into play. As to this, the evidence is: (Agwi Ex. 2) Instruction sheet issued January 11, 1944, by War Shipping Administration, addressed to Cities Service Oil Co., General Agent, Agwilines, Inc., Sub-Agent, re Abiqua at loading berth Pier 37. The instructions are compatible only with the Berth Agency relationship including employment of heavy lift gear for deck cargo, as indicated (fuselages).

728

U. S. Ex. 5—Bill rendered May 10, 1944, by Sub-Agent re T. V. Abiqua, showing balance due for items embraced between January 11, 1944, and January 14, 1944, signed by Sub-Agent, accompanying letter of transmittal dated November 3, 1944. These documents establish so clearly as to exclude any possible doubt to the contrary, that the employment in question was of the Agwilines as Berth Agent of the Abiqua.

I am at loss to understand the opposing argument, which lacks any support in the evidence; even if it were possible to find that the Atwood functioned toward the scow as a terminal operator, her failure to volunteer advice to the Abiqua against permitting the ship's lines to sag, would not relieve the latter for inattention in that respect. Whether the 2-year limitation would protect her is another matter.

If the foregoing is not clearly erroneous, it results that the scow's claim against Agwilines must be measured by the scope of the latter's duty as Berth Agent, having also in mind the failure of the scow-master to observe the ever narrowing margin of open water between the side of his scow and Pier 37, and to make protest to either the tug, those on the derrick, or to anyone else connected with the discharge of cargo, who might be in a position to relay his alarm to those on duty on the Abiqua.

*Did the Abiqua sag on her lines?*

■ An affirmative answer seems to be required, based upon circumstantial evidence only:

It is known that a squeeze occurred, for the wedge had to be broken by the Atwood as stated. The only possible causes were (a) the operations of the derrick or (b) the sagging of the Abiqua's lines.

The first is eliminated because there is no evidence to sustain it, and also because it is opposed to the probabilities. Dipping there was, but it was equal on opposite sides, therefore reciprocal and self-corrective.

There was only sufficient space permitted, between the derrick and the scow, to allow for functioning by the former in the only manner to be expected from the manipulation of the boom, and the lifting operation involved. At most, it would occasion a certain rolling of the scow, without appreciable lateral movement, since the scow was made fast to the derrick.

This conjecture is hazarded in accordance with Surveyor Haight's testimony as understood, and in spite of Hansen's contrary opinion, which was modified as has been recited. He was called in that stage of the libellant's case when reliance seemingly was had upon the fault alleged in the amended libel on the part of the derrick. Subsequent developments rendered that theory untenable.

The sagging of the Abiqua's lines left the only plausible theory to account for the movement of the three vessels across the slip, which resulted in the jam.

The ship was docked on January 11th, at 5:30 P.M. (U. S. Ex. 1). Nothing with reference to her lines appears in the testimony, save what was said by Tuber, a guard employed by the Berth Agent, who went on board in the morning of the 13th. He was a member of the New York City Police Force who was off official duty on this day. He explains the six lines that were out to the Pier (U. S. Ex. 6) and says that there was no change in them while he was on the ship. That she was a foot or two off the Pier at the water-line "pretty snug up". Only the breast lines were horizontal. The spring and bow and stern lines ran down at an angle to the Pier. He said that, as the ship sank in the water, "we did not touch the lines". Seemingly he refers to the tidal change rather than an alteration in the water-line as cargo was taken.

It would be helpful to know at what stage of the tide the lines were rigged, for the stipulated fall from high to mean low water is 4 feet. If mooring was had at half-tide, the rise and fall would draw the tanker closer to the Pier. If it was at high water, then at half-tide the lines would be slack until low tide took up the play. That is the zone of reticence so far as the evidence is concerned.

The Government has produced a tide table for January 13th, as at the Battery, which is agreed to reflect conditions about ten minutes later than at this slip. That

indicates high water about 11 A.M. and low water between 5 and 6 P.M., but whether this is Standard or Eastern War Time does not appear.

Murphy for the tug says that between five and six o'clock on the 14th the tide was still ebb, and that it started so to run about 2:30 P.M., and that the two middle hours are the strongest; and that a northwest wind had been blowing all day. In this he was not contradicted.

While the demonstration of sagging cannot be deemed to be conclusive, it is more than argumentative, and furnishes the only plausible explanation for the lateral movement which caused the scow to close up the 3 or 4 feet as estimated that separated her from Pier 36, when she was landed alongside the derrick. It is sufficiently convincing to support a finding in the absence of other explanation, that breasting off from Pier 36 by the Abiqua must be deemed to have caused the squeezing.

*Can the United States of America be held responsible?*

The answer to this question involves the Berth Agency Agreement, namely, Articles 8 and 16, respecting the undertaking by the Government to hold the Berth Agent free from such asserted liability as is found in libellant's cause, except where loss or damage is caused by willful misconduct, etc.

Having in mind the necessary reliance of the scow upon proper shifting and custody, and the physical conditions which attended the discharge of this most important cargo, it seems not unreasonable to ascribe to the Atwood the duty of at least warning the Abiqua (of which she may be deemed to have been an auxiliary for present purposes) against the possibility of her sagging off from Pier 37 sufficiently to close the narrow gap of from 3 to 4 feet which separated the scow from Pier 37. Had such a warning been given and disregarded, the tug would at least have done her part to prevent what happened.

Likewise, had the scow-master been reasonably attentive to his duties, a timely protest from him would have called attention to the threatening situation.

It cannot be said that the performance of either duty would have been futile. At least no such assumption can be indulged.

It is improbable that the Abiqua (her deck officer) would have been indifferent to such a warning, in view of the obviously crowded condition of the slip, and a natural concern that these planes should not be put to hazard in the course of landing them upon deck in safe condition.

Of the two lapses, I regard that of the scow-master as the more reprehensible, for it was of the essence of his job to observe whatever would jeopardize the safety of the vessel in his keeping, and to promptly and vigorously protest against any peril which he could not frustrate by tending his lines. He had but one responsibility and that one he shirked.

The Atwood of course had to shift all scows engaged in this task, and her immediate concern was both to remove the Seaboard No. 122 from alongside the Comrade, and to haul the Seaboard No. 20 into the space thus left open. That was done in one movement, through the medium of a stern line put out from the No. 122 under the direction of the harbor master Totland, who was working with Murphy of the Atwood. Then the No. 122 had to be towed at once to Pier 34. That scow was about 8 inches narrower than the No. 20, and this was a significant dimension in view of the narrow margin between the side of the scow and Pier 36. Totland at least was required to observe it, whether he did or not, and it was error, I now think, not to have required him to say whether he did (p. 186).

Perhaps it is straining a point to impose the duty of warning the Abiqua of the situation and the necessity on her part of taking in her lines if need be. If error be ascribed to this view because of the tension of war-time necessities (which did not change the legal relationships involved, but which may have evoked some tolerance in appraising the manner of their discharge), it would follow that the libellant was alone at fault.

To be sure, the pressing task of the Atwood involved the No. 122, but if Murphy's

730

cross-examination is understood, there was an interval between its completion and the probable moment of the squeezing, when the Atwood could have hailed the Abiqua for the purpose stated.

This view of the situation has been arrived at with hesitancy and can be supported only by a slender margin of reasoning, if at all.

The legal consequences of the situation as depicted may be thus stated:

Since the libellant and the Abiqua were both at fault, the damages must be divided.

The Atwood, having incurred liability as Berth Agent under the contract pleaded, can look to the Government to hold the respondent harmless, since the damage was not caused by willful misconduct; this obligation of the Government is not barred by the 2-year limitation contained in the Suits in Admiralty Act, and it is therefore unnecessary to decide whether the delay of the libellant in asserting her claim—the nature of which was known to her within one week of the happening—can be held to constitute laches.

That subject would not be presented for decision unless the Atwood were to be held at fault as an independent contractor (terminal agent), and no reason is perceived to conclude that she was, or even so, that she owed to the scow the special duty which has been described.

Thus the otherwise serious questions of the libellant's laches, and its impact upon the Atwood's duties and cross-remedies, are not seen to call for adjudication.

The result is that the libellant may take the customary interlocutory decree for half damages against the Atwood; and that the respondent may take a similar cross-decree for the same sum against the United States of America, respondent-impleaded, pursuant to the provisions of the said contract, Agwilines Exhibit 3, with costs to be taxed.

The Merritt-Chapman & Scott Corporation, claimant of the derrick lighter Comrade, is entitled to a decree against Agwilines, Inc., claimant-respondent, dismissing the impleading petition, but without costs.

Settle decree.